## TALIAFERRO HUNTER *vs.* VAN BOMHORST & CO.

A communication to an attorney, may be confidential, although the party making the communication is, at the time, under an impression that another person also interested in the case, is to pay the attorney's fee.

Notice to an endorser, informing him that a note had not been paid, and that they would be held responsible for the payment thereof, is sufficient, if the note be made payable, and remains for collection at a bank; but where it is not, the notice is not sufficient.

APPEAL from Allegany county court.

This suit was brought upon three promissory notes, the first dated 14th March 1846, drawn by Phineas Janney, to the order of Hunter, defendant, payable at the Western Bank of Baltimore, for $1,300, six months after date, and by Hunter endorsed to the plaintiffs; the second dated 7th December 1846, drawn by Janney, and payable, sixty days after date, to the order of Hunter, at Cumberland Bank of Allegany; and the last dated the 7th December 1846, drawn by Janney, payable to, and endorsed by Hunter, payable four months after date, at Cumberland Bank of Allegany.

The declaration was upon these several notes.   Plea, non assumpsit and issue, and verdict for plaintiffs.

The points arising upon the several exceptions, are presented by the counsel in the argument.

The case was argued before all the judges.

By *Pearre*, for the appellant, and by *Roman* and *McKaig*, for the appellees.

*Pearre*, for the appellant.

The first question, arising on the first bill of exceptions, is as to the admissibility of the letter of the plaintiffs, dated 16th October 1846. This, the appellee contends, is a privileged communication, written by the plaintiffs to W. M. Holliday, as their attorney, in these words:

*Dear Sir:*

We address you at the suggestion of Mr. T. Hunter, to request that you will file a lien under the mechanics lien law of Maryland, against Phineas Janney, Esq., of your place, for the amount of $1,625, the cost of steam engine and boilers furnished said Janney, and which were shipped by us on the 1st of May 1846, and probably came into his possession about 6th of same month. For the payment of said engine, Mr. Janney gave us his three several notes, endorsed by Mr. T. Hunter, payable at the Western Bank of Baltimore; the first dated 14th March 1846, on six months, which was due and protested 14th-17th September, for $813; the second dated same time, payable nine months after date, for $812, and which will be due 14th-17th December next. It is not our wish to annoy Mr. Janney in any wise; but on 3rd instant, we drew on him at three days sight, for $620.95, amount of protested note, interest, protest and exchange. This draft was accepted and again protested at maturity. To-day we received a letter from Mr. Janney, covering two acceptances, the one dated October 16th, 1846, payable fifteen days after date, for $414.55, the other dated October 16th, 1846, payable also at Cumberland, for $417.63, at thirty days after date, which he promises to lack no exertions in meeting; the illness of a friend of his, from whom he was to receive money, being the cause assigned for not meeting the previous draft. Now if Mr. Janney will give undoubted security for the payment of the two acceptances last named, as also for the payment of the note due 14th-17th December, we wish no steps taken against him. If,

however, he does not do this, you will please file the lien as before named. This we feel obliged to do, under the positive instructions of Mr. Hunter. Hawes and Hunter being equally liable with Mr. Janney, for payment of engine, they being the original purchasers, and afterwards selling to Janney, whose paper was given us. Mr. Hunter informs us that we alone have a right to file the lien. He also stated in his letter, October 3rd, that he expected to be in your place the 11th of present month. He has, therefore, doubtless seen you. We wish you to explain the matter fully to Mr. Janney. We have a high opinion of him, and trust that the payments will be met at any cost. Please answer immediately, and give us your opinion fully.      Yours, very respectfully,

S. F. VAN BOMHORST & Co.

WM. J. HOLLIDAY, ESQ., Att'y,

Cumberland, Md.

In connection with this letter, there was proof, by Mr. Holliday, that soon after he received it, he had a conversation with one of the firm, about a week after the receipt of it, in the course of which, he (Holliday,) observed to him, that he had forgotten to say anything about paying him (Holliday,) a fee. The reply was, he did not expect to pay Holliday any fee. He thought Holliday was acting in the business as counsel for Hunter, the defendant in this case, and, therefore, he expected Hunter would pay the fee. Holliday thought otherwise, and the other afterwards consented to pay it, and promised to send it from Pittsburg, which the plaintiff afterwards did.

At the time when this letter was written, Mr. Pearre insisted, that the relation of client and attorney did not exist. He referred to *Gilbert on Evid.*, 136. 2 *Starkie on Evid.*, 230. 13 *John. Reports*, 493, 494. After the relation ceases, communications then made, are evidence. 1*st Green. on Evid.*, sec. 233, *note* 1. 14 *Pick.*, 422.

As to protest, 2nd point, he insisted, that there was no evidence in the cause, from which the jury could find that notice of the dishonor of the note for $813, had been given to Hunter,

so as to bind him. The only evidence is the protest of the note. The protest, after stating the demand, and answer thereto, "no funds," proceeds: "On same day, I addressed written notices to the endorsers of said promissory notes, informing them that it had not been paid, and that they would be held responsible for the payment thereof. Notices enclosed to Wm. H. Denny, Esq., cashier 'Merchants and Manufacturers Bank,' Pittsburg, Pennsylvania, and put in the Baltimore post-office."

Reference was given to *Sangston vs. Graham*, decided this term. *Biles on Bills*, 145, 149. 1 *Doug.*, 296.

The defendant offered proof that the plaintiffs accepted other drafts, with other testimony tending to show that these drafts, when paid, were to satisfy the notes upon which suit was brought, and thereby, time was given to Janney. He insisted, that the giving of this time exonerated the defendant, even if his liability would otherwise have been fixed. See *Byles on Bills*, 141. 2 *Bos. & P.*, 62. *Byles on Bills*, 220. *Pittman on Prin. and Surety*, 175, *in* 40 *Law Lib.* And also same authority, 181. 18 *Chit. on Bills*, 409. *Story on Cont.*, 672. 2 *G. & J.*, 512.

Another proposition, which the appellant undertakes to maintain, is like the last. He insists, that if the drafts just spoken of, were for the same money, for $813 note, the taking of the drafts amounted, in law, to indulgence to Janney for the payment of the $813 note.

The defendant also insisted, that if, from the evidence, the jury were satisfied that the time had been extended for the payment of the original note, then the defendant was exonerated, unless the time was extended with the defendant's consent.

All of these questions were decided against the defendant below, and are presented by the record.

*Roman* on the first point referred to 1 *Green. on Ev.*, *ch.* 13, *sec.* 236, 237, 240, *(note 1.)* 1 *Green. Ev.*, 301. 6 *Eng. C. L. Rep.*, *p.*, 1. 24 *Eng. C. L. Rep.*, 468. 6 *Vez.*, 280. 4 *Esp.*, 235. 12 *Pick.*, 89. 5 *N. H. Rep.*, 94. 14

*John.*, 391.   17 *John.*, 335.   1 *Caine*, 267.   2 *Chit. General Practice*, 20.   4 *Phil. Ev.*, *(Cowen,)* 1572.   All these authorities are to show that the letters written by plaintiff to Mr. Holliday, the attorney, was inadmissible in evidence.

Second point is in relation to the sufficiency of notice. The appellee insists that two letters is dated September 24th, 1846, and written by the defendant; the one to the plaintiffs, and the other to Janney, would have authorised the jury to infer a proper notice of protest.   *Farmers Bank vs. Dewell*, 7 *G. & J.*, 91.

The letter dated 24th September, to Janney, says "I this day received a letter from the Messrs. Van Bomhorst, of Pittsburg, enclosing notice of the protest of your note endorsed by me, dated 14th March 1846, and payable six months after date at the Western Bank, for the sum of $813." and then reminds him of his promise to secure the payments.

The letter to the plaintiffs, acknowledges the receipt of their letter of the 21st, of the protest of the note, described in former letter, greatly to the surprise and mortification of the defendant, and telling the plaintiffs that Janney has unincumbered property near Cumberland ; that he, (defendant,) has written to Janney, urging him to make immediate payment, and he cannot doubt that he will.

In connection with these letters, the admission of the defendant, that a letter mailed in Baltimore on the 17th of the month, after bank hours, could reach Fredericksburg via Pittsburg on the 24th.

He cited 11 *Wheat.*, 437.   *Story on Prom. Notes, sec.* 354. *Berry vs. Crowley*, 4 *Gill.*   *Story on Prom. Notes, sec.* 344. 1 *H. & J.*, 423, 427.   1 *Pick.*, 401.

As to the extension of time.   The new drafts were merely collateral security.   8 *C. L. R.*, 10.   *Pitman on Princ. and Surety*, 40 *L. L.*, 176, 201.   To release the surety, there must also be an agreement to give time.   *Bayley on Bills*, 359.   *Story on Prom. Notes, sec.* 411, 415, 416.   8 *East*, 575.   *Chit. on Bills*, 442.   *Planters Bank vs. Sellman*, 2 *G. & J.*, 230.   7 *Taunt.*, 126.   27 *Pick.*, 151.

*McKaig* for the appellee, remarked upon some of the authorities which had been cited, and in regard to the extension of the time, insisted that such an agreement would be of no effect, there being no consideration.

Cited 7 *Harris and Gill*, 294.   2 *G. & J.*, 171.   9 *G. & J.*, 279.   7 *G. & J.*, 26.

*Pearre* cited *Theobald on Principal and Surety*, 180, and said this authority showed that it ought to be left to the jury whether there was time given.

*Chit. on Bills*, 442.   If fresh security is taken, it will be implied that time was given.

The opinion of the court was delivered by MASON, J.

The first exception in this case raises the question, whether the letter of the plaintiffs to W. M. Holliday, Esq., dated the 16th October 1846, and set out in the record, is a privileged communication, and whether as such it can be used in evidence against them.  If the letter stood alone, unexplained by the testimony of Mr. Holliday, it would clearly have been inadmissible as evidence, from the facts that it was written to an attorney, and upon professional business relating to, and affecting the interests of the plaintiffs.  From these facts alone, the court would recognise such a relation to have existed between the parties, as to render all professional communications between them as confidential.

By the testimony of Mr. Holliday, a different aspect is sought to be given to the matter, and out of this testimony arises the question to which the mind of the court is directed. Upon being asked by the witness, subsequent to the period when the letter was written, for a fee for services rendered in pursuance of that letter, the plaintiff replied that he did not expect to pay the witness, that he considered the witness as acting for Hunter, (the defendant in the present action,) and that he expected Hunter to pay him his fee.  To this the witness did not assent, but insisted upon being compensated by the plaintiffs, which was ultimately done by them.

The view taken by the appellants' counsel, is, that the plaintiff, in effect, disclaimed the relation of client and attorney in the conversation referred to, and that he cannot therefore, afterwards seek to avail himself of the privileges growing out of that relation. We do not so understand the conversation between the plaintiff and the witness. The transaction seems to resolve itself into this simple state of facts. At the instance of the defendant, the plaintiffs consented to institute proceedings against Janney, under the lien law, instead of relying upon the security they already held. In complying with this request of the defendant, it was necessary for the plaintiffs to employ counsel, and to disclose their whole case to him ; and merely because they afterwards expressed the opinion that the fee for those services should be paid by Hunter, they are to be deemed to have thereby forfeited their claims to the benefit of the confidence which should prevail between client and attorney. The services to be rendered by Mr. Holliday in accordance with the request contained in the plaintiffs' letter, were evidently to redound to the benefit of both Hunter and the plaintiffs. But as Hunter stood as surety to the plaintiffs, it was manifest that in their opinion, he was first and mainly to derive advantage from the proceedings to be instituted by the attorney, and therefore, he should be chargeable with the fee. Regarding Hunter as bound and good for the debt, the proceedings against Janney was, at the time, a matter of small consequence to the plaintiffs, and merely as a matter of favor to Hunter, they were commenced, they agreed to strike at Janney's property, rather than at Hunter, and in order to do so, they disclose the merits of their whole case to an attorney. Upon mere principles of justice, apart from rules of law, it would be hard if this defendant were now permitted to turn this act, which was designed as an act of kindness to himself, into the means of defeating the plaintiffs' just debt. It matters not, whether in the opinion of the plaintiffs, the proceedings which they directed the witness to institute, were intended *primarily* for the benefit of Hunter, and therefore ought to have been paid

for by him, they nevertheless related to matters in which the plaintiffs were interested. The difference of opinion between them and Mr. Holliday, grew out of the question, *who should pay the fee*, and not whether the relation of client and attorney existed: and we have besides, the best evidence for supposing that even this disagreement was finally settled, and adverse to the plaintiffs' views, in the fact that the attorney ultimately got the fee from them which he claimed.

For the reasons we have assigned, we think the county court was right in not receiving this testimony.

The second exception presents the question of the sufficiency of the notice of protest. This case, in this respect, is somewhat unlike the case of *Sangston vs. Graham*, determined at the present term of this court. In that case the protest, which was offered to prove a demand, &c., proceeds to say: that he, (the notary,) addressed written notices to the endorsers, informing them that *they were held severally liable for the payment of the note.* This evidence of notice was declared to be insufficient, because no demand upon the maker could be inferred from it. In the case now before us, the protest, after setting out demand, &c., proceeds to say: that written notices were addressed to the endorsers, informing them that the note *had not been paid, and that they would be held responsible for the payment thereof.* Such a notice as this will be sufficient, where the note is made payable and remains for collection at a bank, but where it is not, it would be insufficient notice. Though no special form of notice is necessary, still, in some form, the fact must be substantially stated, that the note is dishonored by default of the promissor. Where a note is made payable at a bank, it is the duty of the maker to pay it at the bank on the last day of grace, if the note is there for collection, and if he fails to do so, the note is dishonored. Notice in such a case to the endorser, that the note *is unpaid*, is a notice that it is dishonored; whereas in other cases, notice in the same words, that the note is unpaid, would not necessarily imply that it was dishonored, because the note might remain unpaid, while, in fact, it may never

have been presented to the maker for payment. The evidence on this point is, however, defective in the fact, that it does not show, in addition to the notes being made payable at the bank, that it was in fact at the bank on the day it became due, ready to be handed over to the maker on being paid. This omission presents the inference of dishonor, that would follow if the note were at the bank to be paid on the day it fell due.

In the case we are now considering, the protest is not the only evidence before the court in regard to the notice. Its omissions are supplied by other proof, and that is to be found in the letter of the defendant himself to the plaintiffs, dated 24th September 1846. In that letter he admits he received *notice of protest;* and in the case of *Barry vs. Crowley,* 4 *Gill,* 202, the court say, that this expression, "in substance, states a demand on the drawer, and notice of non-payment:" and whether that letter, (as was contended in argument,) refers or not to the protest offered in this case, is immaterial; it is no contradiction of the evidence contained in the protest, but merely enlarges it, by supplying material omissions.

It appears also from Hunter's letter, referred to, and from admissions contained in the record, as to the length of time required for letters to pass between Baltimore, Pittsburgh and Fredericksburg, that due diligence was used in transmitting notice of protest to the endorser.

We think the ruling of the court on this exception was right.

Among other evidence offered by the defendant, two drafts were produced, dated 16th October 1846, respectively for $414.55, payable fifteen days after date, and for $417.63, payable thirty days after date, drawn by the plaintiffs and accepted by Janney, the promissor in the original note; also a letter dated the 9th of November 1846, addressed to the defendant by the plaintiffs. Upon this evidence, the court was asked to instruct the jury, that if they believe the two drafts last named were given in lieu of the one for $813, and which forms in part the basis of the present action, that the

plaintiffs thereby released the defendant from his liability as endorser on said note of $813, unless said drafts were drawn with the consent of the defendant. This prayer the county court rejected.

There is no difficulty in laying down the general rule of law upon this subject: it is, that where the holder of a promissory note or bill of exchange enters into an agreement, founded on a valuable consideration with the drawer, to give him further time for payment, without the assent of the endorsers, they will thereby be released from their liability to pay the same. This rule is based upon the equitable principle, that the surety has a right to insist, that the contract into which he entered for the principal, shall not be varied in any way without his assent. Giving time to the maker of a note, would necessarily work such a result. If the holder enters into a valid contract for delay with the maker, he thereby suspends his remedy on the note until the stipulated time expires, and were the endorser to tender the payment of the bill in the meantime, so as to consummate his right of action against the principal, the holder would be bound in good faith to the contract for delay into which he had entered, to refuse the payment; for if he accepted it, and the endorser could thereby, *eo instanti*, commence suit against the maker, it is apparent, that the advantages of the contract would thus be lost to him. If on the other hand payment were refused, the endorser would find his original obligation so altered, as to be materially prejudiced thereby. If he had been allowed to pay the debt at the time when he contracted that it should be paid, the principal debtor might then have the means of repaying him, while, on the contrary, before the expiration of the extended period for payment, the principal might have become insolvent.

The difficulty with the courts grows out of the application of the general rule to particular cases, out of the necessity of determining what constitutes an agreement to give time, and whether there exists a sufficient consideration to support the agreement. It is conceded in all the cases, that if the agree-

ment suspends the right of action on the original debt, it amounts to a discharge of the endorser. There need not be an extinguishment of the original cause of action to work such a result. A cause of action may be suspended and yet not extinguished.

The particular question submitted to us by the exception, we are now considering, is whether an agreement on the part of the holders, by which they received from the drawer other bills accepted by himself, for the amount already due on the previous note, amounts to a valid contract to give time ? In the case of *Gould vs. Robson,* 8 *East.,* 576, which is regarded in all the books as a leading case on this subject, the holder of a draft took a new bill from the acceptor, *and was to keep the original bill as security, till the other was paid.* Lord Ellenborough upon these facts said : "This is an agreement, that in the mean time the original bill shall not be enforced; such is at least the effect of the agreement, and therefore, I think time was given." In the case of *Glenn vs. Smith,* 2 *Gill & John.,* 493, the court decide, that the acceptance of a promissory note by a creditor for a precedent debt, is a suspension of his right of action on the original debt, until the note reaches maturity. In the same case at page 508, chief justice Buchanan says "that the acceptance by a creditor from his debtor, of his promissory note, for an antecedent debt, does not extinguish the original debt, if it remains in the hands of the creditor unpaid, and he can produce it to be cancelled, or show it to be lost." There are other cases which we might cite, if necessary, in support of the same doctrine, but we do not think these authorities need support in this State. If then the principles announced in these two cases be law, we think they settle the question before us. What is the difference between this case, and that of *Gould vs. Robson ?* The only seeming difference between the two cases is, that in the one, "the holder was to keep the original bill, as security, till the other was paid," while in the present case, no such statement appears in the evidence. Does the statement of this fact vary the case? We think not.

Although not stated, the existence of the fact is as manifest as if it were stated.

Did not the plaintiffs actually and in fact, *receive the new drafts, and keep the old note as security?* Otherwise they never would have brought suit upon the old note; and to admit that this fact was altogether out of the present case, (the keeping the original note as security,) would rather make the present, even a stronger case, than that of *Gould vs. Robson.* Nor can we perceive what advantage resulted to the defendant so as to amount to a *valuable consideration,* in the mere fact that the holder was to "keep the original bill as security." It was rather to the holder's benefit than otherwise. Upon common principles of reason, apart from authority, what motive could the parties have had, one in giving, and the other in accepting, the new drafts, if it were not agreed between them, that they were to take the place of the preexisting debt, and that proceedings on the first note were to be suspended, until the other notes became due. If this be not the true construction of this transaction, we are to regard it as a mere piece of unmeaning mockery. Indeed we have been unable to find any case where a different construction has been given to such a transaction, except the case of *Pring vs. Clarkson,* 1 *Barn. and Cress.,* 14. Were we to adopt the principle there announced, we would be disregarding doctrines recognised in numerous other cases of as high authority, and which are more in accordance with our own notions of the law of such cases. Indeed in *Glenn vs. Smith* the court clearly authorise the view we have just expressed. In that case there was no express agreement, that the original cause of action was to be suspended, until the notes given in its place were due. Yet the court say that such was the effect of the acceptance of other notes. In *Glenn vs. Smith* the court put the very case we are now considering, viz: the acceptance by a creditor from his debtor, of a promissory note for a preexisting simple contract debt. What would be the effect? Not an *extinguishment* it is true, provided the new note remains in the creditor's hands *unpaid,* and he can produce it to be cancelled, or show

it to be lost. What does the court mean by being *unpaid,* manifestly unpaid, *after it was due,* for technically speaking a note cannot be *unpaid* until it is due. If then these facts, viz: the note remaining unpaid, its production to be cancelled after it is due, or showing it to be lost, are necessary to prevent an extinguishment of the original cause of action, does it not necessarily follow, that until these circumstances occur, the question even, whether the note be not extinguished, is undetermined or suspended? *a fortiori,* would the mere right to sue on the original debt be suspended?

The authorities are all clear that there must be a *valuable consideration,* for the agreement to delay, in order to bind the parties thereto, but the authorities are by no means so clear upon the question of what constitutes *evidence* of the existence of such consideration. In all the cases referred to on this subject, the courts seem to infer a consideration for the agreement to give time, where that agreement, as in this case, *is evidenced by a new note.* In the case of *Gould vs. Robson,* there was no other consideration proved, than was furnished by the taking of the new bill. In the case of *Butts vs. Dean,* 2 *Medcalf,* 76, it is declared that when a debtor gives his negotiable note to his creditor for a debt due on a single contract, the legal presumption is that the note is received in satisfaction. The same principle is recognised in 1 *Dana,* 82. In the case of *Norton vs. Roberts,* 4 *Munroe,* 491, the holder of a note received from the maker, a part of said note in cash after it was due, and for the remainder, he gave his own notes, at sixty days, and took a receipt on the original note for the new notes. This was held to be a discharge of the surety, because the agreement for time, was a binding contract. In that case no other consideration is proved, than that which can be inferred from the mere taking of the new notes. The case of *Glenn vs. Smith* goes to the same extent. What consideration was there in that case for the agreement, which amounted *to a suspension of the original cause of action,* but the taking of the new notes? None whatever.

Among the many cases cited by the appellee's counsel,

where supposed agreements to give time, were repudiated for the want of sufficient consideration to support them, none of those agreements consisted of a *new note*, except the case of *Pring vs. Clarkson;* and that case turned not upon the sufficiency of the consideration, but upon the ground that there was *no contract at all* for the extension of the time of payment. The distinction for which we contend, is clearly recognised in *McLemore vs. Powell*, 12 *Wheat.*, 554. *Planters Bank vs. Sellman*, 2 *Gill and John.*, 230, and the authorities cited in those two cases. They will be found to embrace nearly all the leading cases which were relied upon by the appellee's counsel in argument.

Of course all that we have said upon this subject has been based upon the hypothesis, that the new drafts *were in fact* given for the original note. This is controverted by the plaintiffs, and it is not our province to decide upon the facts of the case. We are asked, however, by the plaintiffs to reject, the defendant's prayer, upon the additional ground, that conceding, that if the new drafts were taken for the original note that it would release the endorser, yet the evidence is not *legally sufficient*, to authorise the finding of such a fact by the jury.

We do not feel disposed, in considering this case, to discuss the question so often mooted in this court, relating to the separate and independent functions of the court and jury, in regard to the sufficiency, or insufficiency of testimony. It is enough, for the purposes of this case, for the court to say, that it finds testimony sufficient, in the record, which appertains to and tends to the proof of the issue, which would warrant the court in submitting the question to the jury. We wish to be understood as merely saying, that there is legal testimony in the record, which ought to have been submitted to the jury, but that we express no opinion as to the weight or effect to be given to that testimony by the jury.

The fourth exception is substantially the same as the third, and need not be considered at length; and we, therefore, likewise reverse the ruling of the court on this exception.

The main question involved in the fifth exception, has already been disposed of, in the consideration of the third. If the taking of the new notes, *ipso facto*, released the endorser, much more would the endorser be released, if the taking of the new notes were in accordance with a previous express agreement, that time should be given on the original note.

The plaintiffs, however, seemed to rely, in resisting the defendant's prayer contained in this exception, upon the ground, that there was no proof in the record, to warrant any such inference of an agreement. We think the letter of the plaintiffs, dated November 9th, 1846, and the letter of the defendant, offered by the plaintiffs, addressed to Janney, and dated the 24th September 1846, have reference to this transaction, and might throw light upon the minds of the jury, in determining the fact in issue. At all events, it is the opinion of this court, that the letters were sufficient to authorise the granting of the prayer contained in the fifth bill of exception.

In regard to the sixth exception, after the views we have already expressed, there remains very little more to be said. We think, as we have before stated, that there is testimony, in the record, sufficient to warrant the county court in submitting to the jury the question, whether there was a valid agreement between the plaintiffs and Janney, for an extension of the time of the payment of the original note? and that, therefore, the prayer of the defendant ought to have been granted.

This court affirms the ruling of the county court on the first and second exceptions, and reverses it on the third, fourth, fifth and sixth exceptions.

*Judgment reversed, and procedendo awarded.*