DENVER TRAMWAY CO. v. OWENS..

1. ALIGHTING FROM CABLE CAR.

If a cable car stops for a passenger to alight, it is negligence to start the car while the passenger is getting off; but if a passenger steps from the car while it is going at any such rate of speed as eleven miles per hour, such act is gross contributory negligence; a passenger seeking to alight, should wait until the car comes to a full

stop, or, until it is moving so slowly that, under all the circumstances, it is safe to step off.

**2. NEW TRIALS.**

A trial judge may with propriety grant a new trial in case of serious doubt—as where he is convinced that the jury have not fully comprehended, or fairly considered, the evidence, and this, even though he might not be justified in directing a verdict upon the evidence.

**3. INSTRUCTIONS—ABSTRACT, CONCRETE.**

Instructions should not be too general, nor should they be given in the abstract; but, when correct abstract propositions of law are given, and the instructions considered together, advise the jury clearly and in the concrete, the abstract propositions do not necessarily vitiate the charge.

**4. CREDIBILITY OF WITNESSES—WEIGHT OF EVIDENCE.**

The jury are not under all circumstances the *sole* judges of the credibility of the witnesses and of the weight of their testimony, since the court is sometimes justified in directing a verdict upon the evidence; but where it is proper to submit a case to the jury, it is not reversible error to charge them that they are the *sole* judges, etc.

**5. EVIDENCE—NUMBER OF WITNESSES.**

The weight of evidence does not depend wholly upon the number of witnesses testifying to the same matter or transaction; the number of witnesses is to be regarded, but an instruction that the number is controlling, is not proper, if any circumstance to be considered in determining the weight of the testimony is not stated in the instruction.

**6. IMPEACHING EVIDENCE.**

Proper foundation having been laid, a witness may be impeached by showing that he has made statements material to the issue different from his testimony as given; but he cannot be impeached by showing his contradictory statements concerning collateral or immaterial matters.

**7. PARTICULAR HABIT OR CUSTOM.**

In case of doubt as to what a person has done, it may be considered more probable that he has done what he has been in the habit of doing than that he has acted otherwise; hence, the particular habit or custom of an individual may be shown where there is conflicting evidence as to whether he has or has not done some act material to the issue.

**8. ATTORNEY AND CLIENT—PRIVILEGED COMMUNICATIONS.**

The statute excluding an attorney from being examined without the consent of his client as to any communication made by the client to him, or his advice given thereon in the course of professional employment, should be fairly construed and applied according to the plain import of its terms; the statute is for the benefit of the client, not the attorney.

To constitute professional employment, it is not necessary that any retainer should have been paid, promised, or charged for.

An attorney is employed in his professional capacity when he is voluntarily listening to his client's preliminary statement, or giving advice thereon, even though he should, after hearing such statement, decline to be retained further, or the client after hearing the attorney's advice, should decline to further employ him; a breach of professional relations between attorney and client does not of itself remove the seal of silence from the lips of the attorney in respect to matters communicated in confidence.

*Appeal from the District Court of Arapahoe County.*

ACTION for personal injuries occasioned by negligence in the operation of street railway car.   Judgment for plaintiff. Defendant appeals.

### STATEMENT OF PRINCIPAL FACTS.

On February 4, 1889, about nine o'clock in the evening, the plaintiff Ann Owens took passage on one of defendant's cable cars at the corner of 15th and Stout streets, to be carried to the corner of Colfax avenue and Race street.   The conductor did not signal the gripman to stop before reaching Race street; but the car having passed Race street plaintiff signaled the conductor to stop the car, and he thereupon rang the bell for that purpose.

It was a closed car with gripman in front, and passengers' entrance at the rear.   Plaintiff testified that upon the conductor's signal, the car stopped; that she arose and walked to the rear end of the car, and as she did so, asked the conductor complainingly why he always carried her past her place; she testifies positively that the car stopped *still;* that she went out upon the rear platform to alight.   As she got off it appears that she was thrown violently to the ground.

That plaintiff in alighting from the car was thrown to the ground and thereby rendered unconscious the greater part of the time for several days thereafter, is not disputed.   She was undoubtedly seriously bruised and injured by the fall. Her attending physician testified that her skull was fractured; that her health had been thereby greatly impaired; and that

her injuries were likely to be permanent. Other physicians having examined plaintiff expressed the opinion that her skull was not fractured and that she was not so seriously injured.

At the time of the accident plaintiff was a domestic servant; she testified that before the accident her health had been good, and that she had been regularly employed for good wages. The evidence tended to show that since the accident she had, by reason of her injuries, been unable to take care of and support herself or do any work for any considerable length of time. The trial now under review occurred more than three and a half years after the accident.

It is conceded that the car had been running at the rate of eleven miles per hour previous to the accident; and the testimony in behalf of defendant is positive that the car did not slacken its speed at all before the accident. The gripman testified that the signal having been given after the car passed Race street, he treated it as a signal to stop at the next street (Vine street), and so did not slacken speed. The conductor testified that plaintiff stepped off while the car was moving at its full speed. Thus, the distinct issue was presented at the trial: Was the car stopped for plaintiff to alight and was it started again while she was in the act of alighting; or did she get off while the car was running at the rate of eleven miles per hour?

At the time of the accident the only persons upon the car were the gripman, the conductor, the plaintiff, and two other passengers (a colored man and his wife). It is undisputed that plaintiff got off the car at the alley—that is, midway between Race and Vine streets; she was found lying at that point unconscious immediately after the accident. The length of the block between Race and Vine streets, including the alley, is 266 feet. The gripman and the conductor testified that the car did not stop after it passed Race street until it reached Vine street, or near Vine street, and that the car did not slacken its speed at all until after it passed the alley between these two streets.

The colored man testified that he supposed the car was going at its full speed when the accident occurred, but was not paying very much attention; that the car finally stopped about twenty-five or thirty feet before reaching Vine street. The colored woman testified that she had not noticed that the car stopped when Miss Owens went out.

The conductor was the first to reach plaintiff at the place where she had fallen. He testified that her feet were nearest the track and that her head lay toward the east, that is, in the direction the car was going, but more to the south than east. He had raised plaintiff to a sitting posture, and was thus supporting her when the other witnesses arrived.

It was shown in evidence that plaintiff in company with her friend Miss Sphor called upon the colored man and his wife about a month after the accident to ascertain their recollection of the matter. In rebuttal, the proper foundation for impeaching testimony having been laid, Miss Sphor testified that the colored man and his wife then said, in substance, that the car had stopped when plaintiff went out to get off. So, also, in rebuttal, and as impeaching testimony, Miss Keiser testified that the colored woman had told her some weeks before the trial that the conductor rang the bell and that the car stopped before plaintiff got out.

After stating the issues, the court charged the jury as follows :

" 2. The court instructs you that the burden of proof in this case rests upon the plaintiff, and in order to recover, she must satisfy you of the truth of the material allegations of her complaint by a preponderance of the evidence. If she does not so satisfy you, you must find for the defendant.

" 3. The court instructs you that negligence is the violation of that obligation which enjoins care and caution in what we do. It is the doing of something which an ordinarily careful and prudent man would not do under the particular circumstances, or the leaving undone of something which an ordinarily careful and prudent man would do under those circumstances.

" 4. The court instructs you that from the last instruction

you will notice that only that care is required that an ordinarily careful and prudent man would use, but this care must be considered with reference to the object to which it is applied. In determining what amounts to negligence in any particular case, the thing to be cared for and the danger to which it is exposed are the principal considerations. In this case it is for you to determine whether the defendant, by its servants, used such care for the protection and safety of the plaintiff as an ordinarily careful and prudent man would have used under the circumstances. If it did not, and the plaintiff received injuries on account of the negligence of the defendant and not through any want of care on her part, the defendant is liable in damages.

"5. The court instructs you that it was the duty of the plaintiff to use ordinary care as hereinbefore defined, as to her own protection in alighting from defendant's car, and if she was guilty of negligence contributing to the injuries of which she complains, then she cannot recover. That is to say, if the defendant, by its servants, was guilty of negligence, and the plaintiff was also guilty of negligence contributing to her injuries, then the plaintiff cannot recover in this action.

"6. The court instructs you that it was the duty of the plaintiff, in seeking to alight from the cars of the defendant company, to wait until such cars came to a full stop, or were moving so slowly that, under all the circumstances, including the time of night, her sex and condition, it was safe for her to step off; and if she sought to alight from the car before such time, although unless she did so she might be carried by the point where she desired to get off, she was negligent and cannot recover in this case.

"7. The court instructs you that, in determining the amount of damages to which the plaintiff is entitled, if any, you will take into consideration all the facts and circumstances in evidence before you—the nature and extent of the plaintiff's physical injuries, if any, whether such injuries are permanent or temporary, and also such prospective sufferings and loss of health if any, as you may believe, from all the

evidence before you, to be reasonably certain from the injuries she may have received, her capacity for labor prior to such injuries and the amount usually earned by her, if anything, and her diminished capacity for labor, if any, by reason of the injuries claimed to have been received; and if you find for the plaintiff, you will allow her such sum as shall be fair and just between the parties hereto, not exceeding the amount claimed.

" 8. The court instructs you that you are the sole judges of the credibility of the witnesses and the weight to be given to their testimony. In passing upon these matters you may take into consideration the interest, if any, they may have in the result of this action; their conduct upon the witness stand; their intelligence or want of intelligence; their candor or want of candor; their means of knowledge of the facts to which they have testified; any bias that they may have shown in their evidence; and from all the circumstances surrounding them you will give to the evidence of each of them such weight as you shall deem it justly entitled to."

Hospital accommodations, medical treatment, etc., having been provided for plaintiff by defendant, the jury were expressly instructed not to allow them in any event; hence, these items do not appear in Instruction No. 7.

In addition to a general verdict in favor of plaintiff the jury returned answers to certain interrogatories which defendant's counsel requested to have submitted to them, as follows:

" 1. Did said cable car, in response to any stop signal given by the conductor to the gripman, stop anywhere between said Race and Vine streets, to let said plaintiff get off; if so, state whereabouts, measured in the distance from either one of said Vine or Race streets?

" A. Yes, about 133 feet east of Race street.

" 2. Was the said cable car moving at about its regular and usual rate of speed when plaintiff Owens stepped from said car to the ground and received her injuries?

" A. No.

" 3. Do you find the present health and physical condition of the plaintiff is now, as the result of said injuries, different and worse from what it was before the receipt of said injuries ; if so, state in what particulars ?

" A. Yes.    General debility.

" 4. Do you find the plaintiff was permanently or temporarily disabled from and as the result of said injuries ?

" A. Permanently.

" 5. If you answer permanently disabled, state to what extent and in what respect plaintiff is permanently disabled.

" A. Disabled to the extent that she cannot earn her own living."

Mr. J. H. BROWN and Mr. MILTON SMITH, for appellant.

Messrs. WELLS, McNEAL & TAYLOR, for appellee.

MR. JUSTICE ELLIOTT delivered the opinion of the court.

At the trial of this case there was a sharp conflict of evidence going to the very substance of the issue and to the very gist of the action. Plaintiff testified positively that the car stopped for her to alight; some of defendant's witnesses testified with equal positiveness that the car did not stop, not even slacken its speed for that purpose.

1. If, as claimed by plaintiff, the car was stopped for her to alight, and she attempted to alight while it was so stopped, then it was negligence on the part of the defendant company to start the car again before she got safely off. On the other hand, if plaintiff stepped from the car while it was going at any such rate of speed as eleven miles per hour, such act was gross contributory negligence on her part.

2. It is urged with much force in this case that the evidence preponderates so strongly against plaintiff that a verdict in her favor cannot be sustained as a matter of law. It is conceded that the cause has been tried five times before a jury. The first time the verdict was in favor of plaintiff;

at the second and third trials the jury disagreed; on the fourth trial the verdict was in favor of plaintiff, and the presiding judge, Hon. J. A. Bentley, set the verdict aside. His reasons therefor were offered on this trial in support of defendant's motion to take the case from the jury. Among other things, Judge Bentley said:

" I think the verdict ought to be set aside, for the simple reason that there is not sufficient satisfactory proof in the case to sustain that verdict.

" It is true that the plaintiff testifies that the car stopped when she attempted to alight, and started again while she was attempting to alight ; but it is an unquestioned fact that she was, at the very moment of the accident, thrown into a condition of unconsciousness, from which she awoke only periodically for quite a large number of days ; and it may well be considered that her testimony should be rather carefully scrutinized as to its being absolutely correct as to exactly what occurred. But there are some physical facts in this case which I regard as overwhelmingly against her statement. Her injury was upon the back of her head. She was found lying upon her back, with her head in the direction in which the car was moving, unconscious. Now, that points to something. That points to the fact that she reached the ground when the motion of her body was very strongly to the forward—towards the way the car was going. The conductor testifies that when he saw her getting off the car, her back was turned in the direction in which the car was moving, and she was going down the railing on the steps.

\*     \*     \*     \*     \*     \*     \*     \*

" Although it is the fourth trial, and ordinarily the court would act with great reluctance, it does now act, and reaches this conclusion with the greatest reluctance ; still I feel it is my duty to set aside the verdict and grant a new trial."

We are not disposed to question the wisdom of the court's action in granting the new trial. The evidence as it then appeared is not before us, except such as is stated in the judge's opinion. At that time, though there had been four

trials, two of them had been *mistrials*. The presiding judge had listened to the evidence, and he might with propriety conclude that he ought to take the verdict of another jury before rendering final judgment. If judges at *nisi prius* would review their proceedings a little more rigidly, and grant new trials a little more readily in cases of serious doubt, there might be fewer appeals or fewer reversals in the appellate courts.

The position in which plaintiff's body was found lying immediately after the accident cannot be regarded as decisive of the issue of negligence or contributory negligence. The car was moving eastward when plaintiff alighted, so say both parties; whether at the rate of eleven miles per hour or just starting at a slower rate is the precise question of fact in dispute. In behalf of plaintiff it is contended that the car started while she was in the act of alighting, and so was in fact moving before her feet touched the ground; if she had succeeded in getting off while the car was at a standstill, there would have been no accident.

The conductor testified that plaintiff's head was lying toward the east when he found her; on cross-examination he said her head was "a little more to the south than it was to the east." He was the only person testifying upon this point, for he had raised her body to a "sitting posture" when the other witnesses arrived. Accepting his statement as correct, what conclusion is to be drawn? The circumstances must be considered; it was a closed car; the exit was at the rear; plaintiff arose and walked out upon the rear platform; but it is not the theory of either party that she was jerked off the rear platform by the sudden starting of the car; there was a railing at the rear of the platform; and the conductor testified that he saw plaintiff going down the steps to the south side of the car, and that she "stepped off."

The car being in motion gave a certain momentum to plaintiff's body in the direction it was moving; by alighting upon the immovable earth, the momentum of her feet was suddenly arrested while the momentum of her body continued; thus,

the tendency was to cause her to fall toward the east, except as her voluntary motion toward the south in getting off acting conjointly with the motion of the car toward the east, gave to her body a resultant force or momentum toward the southeast. This was the tendency whatever the velocity of the car. It is conceded that such would have been the tendency if plaintiff had alighted when the car was moving at the rate of eleven miles per hour; but the tendency would not have been different, except in degree, if she alighted while it was moving at a slower rate—as just after starting. So long as she was supported by the car, its movement would give momentum to her body in the direction it was moving. It is not impossible that the car started, and thereby gave such momentum to her body while she stood poised upon the steps in the act of alighting, when it was too late for her to recoil, but before she had actually consummated the act of alighting by placing her feet upon the ground. Thus, it appears that plaintiff's theory is not necessarily inconsistent with natural laws.

Again, plaintiff may not have fallen in the direction in which her body was found; it must be borne in mind that time enough elapsed after her fall and before she was found, for her to have writhed about and to have changed position more or less.

In the foregoing discussion we must not be understood as expressing any opinion as to the real facts; it is not our province to adopt or reject any of the theories presented. The position in which plaintiff's body was found after the accident was a matter for argument and consideration by the jury; but it would be usurping the province of the jury for the courts to hold the same decisive as a matter of law.

On motion for a new trial, after the fifth trial (the one now under review) Hon. A. J. Rising, the presiding judge, among other things, said:

"There are no new questions presented in this argument that were not presented at the time of the trial, so far as law questions are concerned, and really there are no new propo-

sitions presented in relation to the evidence, because the sufficiency of the evidence to warrant the verdict in every respect, except as to the amount, was challenged by the request to charge the jury to find for the defendant.

"Five trials have been had, if I understood counsel correctly, at the first of which a verdict was found for the plaintiff, the second and third juries disagreeing, and on the fourth and fifth trials a verdict was found for the plaintiff. There is some significance in this with respect to the question of the passion or prejudice of the jury, because where there is a conflict of the evidence, to authorize the court to set a verdict aside he must find something more than that there is a preponderance either the one way or the other; he must find that there is such a preponderance as establishes the fact that the jury must have been influenced by passion or prejudice, or have utterly misconceived the application of the evidence. Now, when three juries have found the same way, it would be rather a harsh comment upon their action to say that they had each been influenced by passion or prejudice, or that the attorneys had not so presented their case, after the first trial at least, that there would be any such thing as their getting off wrong upon a misapplication of the evidence, so, it seems to me, it must be taken for granted that this is not a case where the court should set aside the verdict because of the insufficiency of the evidence.

\*    \*    \*    \*    \*    \*    \*    \*

"The only serious question in my mind, is as to the question of damages. I think the damages are large, but that they are so large as to warrant the court to interfere is very doubtful. Courts go a good ways in upholding verdicts on that ground.

\*    \*    \*    \*    \*    \*    \*    \*

"Here, in this case, is a woman, very little advanced beyond thirty years of age. The evidence shows, or at least tends to show, that she, by reason of this injury, is in poor health, and has been in poor health ever since, and suffers pain and discomfort by reason of this poor health."

In some cases it is difficult for the court to determine whether it should or should not withdraw the question of negligence, or of contributory negligence, from the jury. This subject was much considered in *Lord v. Pueblo S. & R. Co.*, 12 Colo. 390; the doctrine there announced may be considered the settled law under our present practice; but there is difficulty, nevertheless, in the application of those rules to particular cases. Upon careful review and consideration of the evidence in this case, we are of opinion that the trial court would not have been warranted in directing a verdict in favor of defendant. The issue was one which either party was entitled to have tried by a jury. Code, sec. 173. Upon the evidence adduced, the decision of the jury must be accepted as final, whatever may be the private opinion of the judges, unless substantial error prejudicial to the defeated party intervened at the trial.

The opinion of Judge Bentley does not necessarily indicate that he would have ultimately directed a verdict in favor of defendant; he simply granted a new trial. A judge may properly grant a new trial where he is convinced that the jury have not fully comprehended or fairly considered the evidence, even though he would not be justified in directing a verdict. This view is clearly expressed in the opinion of Judge Rising.

In *Green v. Taney*, 7 Colo. 278, Mr. Justice Helm delivering the opinion of the court said: "This court will only interfere where, upon the whole record, it appears that the jury acted so unreasonably in weighing testimony as to suggest a strong presumption that their minds were swayed by passion or prejudice, or that they were governed by some motive other than that of awarding impartial justice to the contending parties." See, also, *Bartelott v. International Bank*, 119 Ill. 259.

3. Errors are assigned to the charge of the court. See statement and instruction prefixed to this opinion. It is objected that certain instructions "were too general and abstract, and practically referred questions of law, as well as

of fact, to the jury." This objection is urged against in-structions 2, 3 and 4, upon the questions of negligence and contributory negligence. It is not contended that these in-structions are erroneous as abstract propositions of law. There would be much force in the objection if instructions 2, 3 and 4 stood alone; but the objection is obviated by in-structions 5 and 6; the whole charge upon the same subject must be considered together; thus considered, the charge advised the jury concerning the evidence applicable to the issues clearly and in the concrete. *Union Gold M. Co. v. Rocky Mt. Nat. Bk.*, 2 Colo. 566; *Finerty v. Fritz*, 6 Colo. 136; *Marsh v. Cramer*, 16 Colo. 334; *Moffatt v. Tenney*, 17 Colo. 199.

The objection that instruction No. 7 directed the jury to allow plaintiff such damages as should be fair and just between the parties, without reference to the evidence, is un-tenable. The instruction expressly directed the attention of the jury to the evidence before them, and to the facts and circumstances in detail to be considered in determining the amount of the damages, in case they should find for plaintiff. It is not urged that the elements of damage were improperly specified; but the last clause of the instruction is complained of. Counsel cite the case of *Penn. R. R. Co. v. Vandever*, 36 Pa. St. 298, where the court said it was " clearly wrong " to charge the jury as follows:

" The question of damages is for you. Should you feel it necessary to examine that question, let fair and exact justice be your guide, and your own good sense will determine it."

Counsel, also, cite the case of *Hawkes v. K. C. S. Yards*, 103 Mo. 69, where it was held that a charge is erroneous which, " *without designating the proper elements of damages*, merely tells the jury that, in the event of a verdict for the plaintiff, they will find in such sum as will compensate him for his injuries."

The want of analogy between the instructions cited, and the complete instruction given in the present case, is clearly apparent. In respect to the amount of damages to be

awarded in cases of personal injuries, see *Wall v. Livezay*, 6 Colo. 474, and cases there cited.

4. The giving of instruction No. 8 is assigned for error. It is contended that the jury are not the *sole* judges of the credibility of the witnesses nor of the weight to be given to their testimony.  It may be conceded that the jury are not, under all circumstances, the *sole* judges of such matters—as, for example, when the court, under proper circumstances, directs a verdict upon the evidence.  It follows that by the use of the word *sole* the instruction was not theoretically correct as an abstract legal proposition applicable to all cases. But the word was neither erroneous nor misleading in its *practical effect, as used under the circumstances.*  Though it is better practice to omit the word, yet, if used, we can hardly conceive of a case that would justify a reversal on that ground alone.  In a case proper to be submitted to a jury, they are necessarily the judges of the credibility of the witnesses and of the weight to be given to their testimony; subject to the instructions actually given by the court; in their retirement the jury can have no further counsel, unless further instructions be subsequently given; hence, of necessity they become the *sole* judges of the credibility of the witnesses and of the weight to be given to their testimony, subject to the instructions of the court which accompany them, and which they are presumed to duly consider as a whole.  Therefore, for the time being and for the purpose of considering of their verdict, the jury in this case were the sole judges, as stated in the instruction, and it was *solely* for that occasion and for that purpose that the instruction was given.  To hold otherwise, would be to invade the province of the jury and practically overthrow their authority in their appropriate sphere.  See 2 Thompson on Trials, sec. 2418; also, *K. P. Ry. Co. v. Twombly*, 3 Colo. 125; and *Whitten v. The State*, 47 Ga. 300.

5. The court was requested to charge the jury, in substance, as follows: If you find from the evidence that the testimony of plaintiff Owens as to how the injury was re-

ceived, is contradicted by the testimony of Evans, Clark and Mr. and Mrs. Cruse, or by any two of them, and that such witnesses were possessed of equal means of knowledge as to how the injury to plaintiff was occasioned, and that such witnesses have no special interest in the result of the controversy, and are of equal credibility with plaintiff, then plaintiff has failed to make out her case by a preponderance of the evidence, and your verdict must be for the defendant.

Was it error to refuse such request to charge? The request names certain witnesses; it does not name all; it does not name the two witnesses who gave testimony tending to impeach Mr. and Mrs. Cruse. The instruction was calculated to mislead rather than aid the jury; its tendency was to establish a sort of mathematical or numerical criterion for determining the weight of testimony. It was contrary to the maxim, *ponderantur testes non numerantur.* See Starkie's Ev. 832; also, 2 Thompson on Trials, secs. 2421, 2422. In *Green v. Taney, supra,* it was said:

" The weight of evidence does not wholly consist in its volume, nor in the number of individuals sworn. That is a most beneficent evidential rule, which gives juries a large discretion in judging of the credibility of witnesses; which makes it peculiarly their province to discriminate between those who testify before them, and imposes upon them the duty of sifting the evidence, accepting the true and rejecting the false."

6. Plaintiff was asked on cross-examination if she had not, previous to the time when she was injured, had words with one of defendant's conductors about being carried by her stopping place. She answered several questions of this character. She was then asked if, on a previous trial of this case, on June 17, 1890, or about that date, before Judge Allen, she had not testified to trouble between herself and one of the conductors on account of his carrying her to Vine street on an occasion previous to her injury; and if she did not on that occasion testify that she then gave the conductor a piece of her mind, and told him that if he would get off she

would lick him. Plaintiff denied having given such testimony. On the defense, defendant called the official stenographer who took the evidence at the June trial, 1890, and by him offered to show that plaintiff did give the testimony thus inquired about. The rejection of this offer is assigned for error.

The supposed violent words did not occur on the occasion of the accident, nor were they connected with that transaction, nor had they been given in chief on this trial; they were not, therefore, a part of the *res gestæ.* But were they admissible as impeaching testimony, or for any other purpose? After proper foundation laid, a witness may be impeached by showing that he has made some statement material to the issue different from the testimony he has given ; but he cannot be impeached by showing that he has made a contradictory statement concerning some collateral or immaterial matters ; and such was the nature of the testimony offered. 1 Greenleaf's Ev. sec. 449.

The evidence offered was not admissible to show the character or temper of plaintiff ; her character was not involved in the issue, except as it might be considered in relation to her veracity as a witness ; and her character for veracity was not open to attack in the manner proposed; nor was the temper of the plaintiff material to the issue, except as it may have been exhibited at the time of the accident, and the testimony offered did not relate to that time.

7. The gripman being sworn as a witness for defendant was asked : " Was there any custom or usage in respect to the place of stopping cars ? " He answered : " We had orders not to stop in the middle of the block." Objection to this testimony was sustained ; and the ruling is assigned for error.

Whether the custom or usage of a corporation may be given in evidence in its own behalf in case it is charged with some act causing injury and damage, and the defense is that the act was done in pursuance of a proper usage or custom well known to the party complaining, is a question not directly involved in this controversy. Plaintiff did not complain be-

cause the car was not stopped in the middle of the block. On the contrary, she asserts that the car *was stopped in the middle of the block*, and that being so stopped, it was negligence to start it again before she had got safely off. She does not complain of negligent *stopping*, nor of *failing to stop*, but of negligent *starting*.

If it had been proposed to show that the gripman had been in the service of the company for considerable time, and that it had been his particular habit or custom not to stop in the middle of the block, this would have lent corroboration to his testimony that he did not so stop; for in case of doubt as to what a person has done, it may be considered more probable that he has done what he has been in the habit of doing, than that he has acted otherwise. Lawson's Usages and Customs, sec. 46; *State v. Railroad*, 52 N. H. 549. But the offer of testimony did not extend that far; nor was such view urged upon the trial court. The reasons stated at the trial, for and against the admission of the testimony, were as follows:

"Mr. Brown. It is *only* in explanation of why he continued on to Vine street after receiving the signal, is all.

"Mr. Taylor. It is immaterial what caused him to do it; the question is whether he did it or not.

"The Court. If the only thing that is material is whether he did it or not, I can't see that it is material why he did it.

"Mr. Brown. The custom and usage of the company are material and part of the *res gestæ*."

Upon the grounds thus presented for the admission of the testimony, the ruling of the court was right; but conceding that it was competent to prove that the rules, orders, or usages of the company were not to stop in the middle of a block on the ground that it may be presumed, until the contrary is proved, that the gripman obeyed such orders, we find upon examination that such orders were abundantly proved by the same witness without objection or remark from any one, both before and after the ruling complained of. Before the ruling the gripman had testified as follows:

"Q. State all you know of the occurrence.

"A. As near as I can remember, we crossed Race street and got near the alley before I got the signal to stop; I got one bell, and we had orders not to stop in the middle of the block to discharge passengers, and I went on to the next street, or nearly there, to Vine street. And there was a colored person came to the front door of the car, and said there was a lady fell off the car and got hurt, so then I stopped the car as soon as I could."

Again, on re-examination after the ruling complained of, the gripman testified:

"I got one tap of the bell, was all the signal I got.

"Q. What was that signal?

"A. One tap of the bell means stop.

"Q. Stop the car where?

"A. At the other side of the crossing, on Vine street; I got it at the alley between Race and Vine.

"Q. That signal was understood by you to stop on the far side of the next street which you were then approaching?

"A. Yes, sir.

There was no evidence contrary to the foregoing concerning rules, orders or usages of the company in respect to stopping in the middle of a block; so that the full weight of such evidence was before the jury to be weighed by them in connection with the direct testimony as to whether the car did or did not actually stop at the middle of the block when and where plaintiff was injured.

8. Mr. C. V. Mead, an attorney at law of several years in Denver, was called as a witness for defendant. He testified that shortly after the accident, plaintiff came to his office and that he had a talk with her "about the facts of this case." He was then asked to state what that conversation was.

Plaintiff's counsel being permitted to first cross-examine, the witness testified that the conversation between himself and plaintiff was in his "professional capacity;" that she was consulting him "as an attorney in relation to her case."

On further examination in chief he stated that he had

never before seen plaintiff on professional business; that she had never been a client of his before that time; that the relation of attorney and client never existed between them prior to that time; that she did not pay nor agree to pay any retainer fee; that there was no talk about fees or compensation, and no contract or agreement with her at all.

The witness was then asked if he made any charge against plaintiff for the consultation. This was objected to as immaterial, and the objection was sustained.

Counsel for defendant then stated to Mr. Mead the substance of plaintiff's testimony as to the manner in which she had been injured, and thereupon asked if plaintiff's statement to him as to the occurrence resulting in her injury was materially or substantially different from what she had thus testified. The court sustained plaintiff's objection to the testimony thus sought to be elicited. These rulings are assigned for error.

At common law *professional communications* between an attorney and his client relating to the business affairs of the latter were privileged. Lord Brougham states the reason of the rule as follows:

"The foundation of this rule is not difficult to discover. It is not (as has sometimes been said) on account of any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection, though certainly it may not be very easy to discover, why a like privilege has been refused to others, and especially to medical advisers.

"But it is out of regard to the interests of justice which cannot be upholden and to the administration of justice, which cannot go on without the aid of men skilled in jurisprudence, in the practice of the courts, and in those matters affecting rights and obligations which form the subject of all judicial proceedings. If the privilege did not exist at all, every one would be thrown upon his own legal resources. Deprived of all professional assistance, a man would not venture to consult any skillful person, or would only dare to tell his coun-

selor half his case. If the privilege were confined to communications connected with suits begun, or intended, or expected, or apprehended, no one could safely adopt such precautions as might eventually render any proceedings successful, or all proceedings superfluous." *Greenough v. Gaskell*, 1 My. & K. (7 Eng. Ch.) 103.

According to one author the rule had its origin in the fact that at common law parties were not competent witnesses in their own behalf, and could not be compelled to disclose facts known only to themselves. Weeks on Attorneys, sec. 142. The general rule now being that parties are competent witnesses, and that they may be compelled to testify in civil cases, it is urged that the rule in regard to professional communications should be relaxed. *Cessante ratione, cessat lex.* There would be some force in this argument if the rule rested alone upon the common law; but we have a statute passed long after parties were made competent witnesses in this state, which reads as follows:

" An attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment." Gen. Statutes, sec. 3649.

When a party invokes the protection of the statute, it should not be unduly extended or restricted, but should be fairly construed and applied according to the plain import of its terms so as to effectuate its intent and purpose. The statute is intended for the benefit of the client, not the attorney.

In determining whether or not an attorney should be required or permitted to testify to a conversation between himself and another person without the consent of the latter, the test is: Had such person at the time of the conversation employed the attorney in his professional capacity in respect to the subject-matter of the conversation? If yes, the testimony would not be admissible; otherwise, it would be. It becomes necessary, therefore, to determine whether plaintiff

had employed Mr. Mead in his professional capacity as attorney at the time of the conversation inquired about.

To constitute professional employment, it is not essential that the client should have employed the attorney professionally on any previous occasion. Such a limitation of the rule would bear hard upon a person involved in legal controversy for the first time, and also upon an attorney with his first cause. It is not necessary that any retainer should have been paid, promised, or charged for; nor are such matters of any importance except as they may tend to show whether the attorney was or was not professionally employed; neither is it material that there was a suit pending at the time of the consultation, nor that the attorney consulted did not afterwards undertake the case about which the consultation was had.

If a person, in respect to his business affairs or troubles of any kind, consults with an attorney in his professional capacity with the view to obtaining professional advice or assistance, and the attorney voluntarily permits or acquiesces in such consultation, then the professional employment must be regarded as established; and the communication made by the client or advice given by the attorney under such circumstances is privileged.

An attorney is employed—that is, he is engaged in his professional capacity as a lawyer or counselor—when he is listening to his client's preliminary statement of his case, or when he is giving advice thereon, just as truly as when he is drawing his client's pleadings, or advocating his client's cause in open court. It is the consultation between attorney and client which is privileged, and which must ever remain so, even though the attorney, after hearing the preliminary statement, should decline to be retained further in the cause, or the client, after hearing the attorney's advice, should decline to further employ him. The general rule undoubtedly is that a breach of professional relations between attorney and client, whatever may be the cause, does not of itself remove the seal of silence from the lips of the attorney in re-

spect to matters received by him in confidence from his client. *Foster v. Hall*, 12 Pick. 89; *Hunter v. Van Bomhorst*, 1 Md. 504; *Cross v. Riggins*, 50 Mo. 335.

In this case it appears that the conductor Evans was present at the conversation between Mr. Mead and the plaintiff. It does not appear whether he heard or participated in such conversation, nor is it material whether he did or did not. The rule excluding the attorney from testifying did not extend to Evans, and there is no reason why he might not have been required to state the conversation, if he heard it. But the fact that Evans might have testified, did not make the attorney a competent witness without his client's consent. The statute contains no such exception, nor was the consultation held in the presence of opposing parties, or of all parties interested. It does not appear that Evans represented any party in interest or anybody at all, for that matter. *Rex v. Brewer*, 6 Car. & P. 476.

This appeal has been ably prosecuted. Exhaustive arguments, oral and printed, have been presented, numerous authorities have been cited; we have endeavored to give the same careful consideration; and thus, this opinion has been much extended. Of the matters assigned for error and urged upon our consideration we find nothing to justify this court in awarding another trial of this much-tried cause. The record as a whole shows that the cause was carefully tried; and the judgment of the district court must accordingly be affirmed.

*Affirmed.*

### ON PETITION FOR REHEARING.

PER CURIAM. Counsel urge the following among other grounds for a rehearing:

"The general instructions given in this case were not cured by the specific instruction hypothetically applied to the facts of Miss Owens' attempt to alight from the car. Her testimony established two independent, distinct causes of action:

"(1) The negligently carrying of Miss Owens past her destination, *i. e.*, the corner of Race and Colfax.

" (2) The failure of the company to allow her sufficient time within which to safely alight from the car.

" Her testimony clearly and fully established *prima facie* both of these causes of action. Her testimony as to the first one, *i. e.*, carrying her past her destination, was not denied. * * * Of course, as a matter of law, the judgment * * * upon the first cause of action, namely, carrying her past her destination, would be clearly excessive and unwarranted. But who can say upon which theory, under the general instructions in this case, the jury proceeded in finding its verdict? So far as Miss Owens' testimony is concerned, a verdict in her favor would be warranted upon either cause of action, and, therefore, it is submitted that the specific instruction as to what would constitute negligence by Miss Owens in alighting from the car, did not correct the error of the general instructions given in this case."

The view thus clearly presented was not discussed in the former opinion, though it was fully considered before that opinion was announced. The argument is forcibly put, but the record furnishes a complete answer to it.

*First :* Plaintiff did not by her suit claim any damages on the ground that she had been negligently carried past her destination. The only allegation of negligence stated in her complaint was as follows:

" That defendant so negligently, carelessly and unskillfully managed and operated its said railway, and the cars aforesaid, that said plaintiff when attempting to alight from the said car, and while exercising all due care in that behalf, was suddenly and violently thrown to the ground, and thereby was greatly bruised and wounded in and upon the head of plaintiff and upon other parts of the body of plaintiff."

*Second :* The first instruction given by the court to the jury definitely specified the sole ground upon which plaintiff claimed a recovery. It stated plaintiff's claim as follows: That the defendant company was a carrier of passengers for hire,

and "received plaintiff on one of its cars and for a certain hire and reward paid by plaintiff undertook her carriage along Fifteenth street and the said Colfax avenue; that defendant so negligently, carelessly and unskillfully managed and operated its said railroad and cars that plaintiff, while attempting to alight from said car, and while exercising all due care on her part, was suddenly and violently thrown to the ground, and thereby was greatly bruised and wounded in and upon her head and other parts of her body, and was made unconscious, and then suffered and from thence hitherto hath suffered great pain in body and mind by reason of said injury." This, in connection with the other instructions, restricted plaintiff's claim to recover to the second ground above stated.

There is nothing in the pleadings, or in the charge of the court to the jury, to indicate that plaintiff had any other cause of action than as above stated; nor does it appear that any other ground of complaint was urged against the defendant company at the trial. It would be entirely unwarranted, therefore, for this court to indulge the supposition that the jury might have based their verdict upon some other cause of action.

The other grounds upon which a rehearing is asked were sufficiently discussed in the former opinion. This case, owing to its apparent hardship against the appellant company, has been presented by counsel with great zeal and ability; but upon careful consideration, there appears no substantial ground to justify an appellate court in disturbing the final judgment in the case. The petition for rehearing must, therefore, be denied.

*Rehearing denied.*