William H. **BLOSKAS** and Floriene V. Bloskas, Petitioners,

v.

Douglas H. **MURRAY**, M.D., Respondent.

No. 80SC262.

Supreme Court of Colorado.

June 7, 1982.

As Modified on Denial of Rehearing
June 28, 1982.

**908**

Williams, Trine, Greenstein & Griffith, P. C., William A. Trine, Boulder, for petitioners.

Johnson, Mahoney & Scott, P. C., Roger F. Johnson, Brian J. Lampert, Denver, for respondent.

QUINN, Justice.

We granted certiorari to review the decision of the Court of Appeals in *Bloskas v. Murray*, Colo.App., 618 P.2d 719 (1980), which affirmed a judgment for the defendant, Dr. Douglas H. Murray, in an action brought by the plaintiffs, William H. and Floriene V. Bloskas, arising out of ankle replacement surgery performed by the defendant on Mr. Bloskas.[1] The plaintiffs' claims were based on the lack of informed consent to the surgery and on negligent misrepresentation. The trial court refused to instruct on negligent misrepresentation and submitted the case to the jury only on their claim of lack of informed consent. The jury returned a verdict for the defendant and the Court of Appeals, finding no error, affirmed the judgment. We affirm that part of the judgment upholding the jury verdict for the defendant on the claim for lack of informed consent. We reverse that part of the judgment holding that the plaintiffs' claim for negligent misrepresentation should not have been submitted to the jury, and we remand for a new trial on that claim.

## I.

In March 1973 Mr. Bloskas fractured his right ankle when he was thrown from a horse. Dr. Cloyd Arford performed surgery to reduce the fracture and inserted a screw into the ankle. Severe arthritis thereafter developed in the joint and Dr. Arford recommended an ankle fusion. Mr. Bloskas decided to consult another orthopedic surgeon before agreeing to the fusion, and the plaintiffs met with the defendant, Dr. Murray, on March 8, 1974. Dr. Murray agreed with Dr. Arford's recommendation but suggested first removing the screw to alleviate the pain. The screw was removed, and although that procedure provided temporary relief, the pain returned and became progressively worse. After consulting again with Dr. Murray on September 18, 1974, Mr. Bloskas consented to a total ankle replacement which Dr. Murray performed on October 16, 1974. Unfortunately, after the implantation of the artificial ankle, the ankle and surrounding tissue became infected. When treatment with antibiotics proved unsuccessful, Dr. Murray removed the artificial ankle and later made four attempts to fuse the ankle, all of which failed because of persisting infection. Mr. Bloskas consulted another orthopedic surgeon, Dr. Jerome Wiedel, who on July 19, 1976, amputated Mr. Bloskas' right leg below the knee.

At trial Mr. Bloskas testified that at no time prior to the ankle replacement did Dr. Murray inform him of any risks associated with the surgery, nor did he advise him that the long-range effects of the procedure were unknown. Expert witnesses called by the plaintiffs testified that amputation resulting from infection is always a risk in ankle replacement surgery. According to these experts a reasonable physician practicing orthopedic surgery would advise a patient not only that the long-range effects of the replacement procedure are unknown but also that the removal of an artificial joint increases the risk of infection and makes further attempts at fusion more difficult, with an enhanced risk of amputation.

Dr. Murray testified that he had never personally performed an ankle replacement prior to the one attempted on Mr. Bloskas

1. The claims of Mrs. Bloskas were for loss of consortium based on the injury and disability sustained by her husband from the ankle replacement surgery. In this opinion there is no reason to differentiate the consortium aspects of Mrs. Bloskas' claims from those of her husband and, therefore, we refer to their respective claims as "plaintiffs' claims."

and had not developed a routine with respect to ankle implants. He admitted that he had no independent recollection of informing Mr. Bloskas of any risks or dangers associated with the surgery. Over the plaintiffs' objection he was permitted to testify that, when performing joint replacement surgery on the knees and hips, he routinely advised patients of the risks of infection and of the loosening of the implanted devices. If either of these conditions developed, then, according to the defendant, the removal of the implant and the fusion of the joint would be necessary. Although Dr. Murray acknowledged that the risks vary depending on the precise joint being replaced, it was his opinion that an advisement about the risks of infection and implant loosening would be in conformity with the community standards of practice in orthopedic surgery with respect to ankle replacements. Another orthopedic surgeon, Dr. Murray's partner, confirmed that advising an ankle replacement patient of the risks of infection and loosening would comport with community standards of informed consent.

The evidence on the negligent misrepresentation claim related to the plaintiffs' discussion with Dr. Murray on September 18, 1974. According to Mr. Bloskas, in the course of discussing an ankle fusion with Dr. Murray, the doctor informed him that he also could perform a total ankle replacement. Mr. Bloskas testified that Dr. Murray said, "I performed three of these, and they have all been successful."[2] When he asked Dr. Murray what would happen if the ankle replacement did not work, Dr. Mur-

ray replied, "The worst that could happen is that we will just take that out and fuse it." When Mr. and Mrs. Bloskas expressed concern about the risk of amputation, Dr. Murray told them that it was "not a problem" and "not something they should worry about." After the doctor explained the method of implanting the artificial ankle, the expected range of movement after its implantation, and the advantages of ankle replacement over ankle fusion, Mr. Bloskas agreed to submit to the ankle replacement surgery.

At the close of the evidence the plaintiffs unsuccessfully moved for a directed verdict on their claim for lack of informed consent. During a hearing on the settlement of instructions the court rejected the plaintiffs' tendered instruction which stated that Dr. Murray had the duty to advise Mr. Bloskas of "substantial risks" involved in the ankle replacement surgery as well as "special risks" which were known or ought to have been known by the defendant. Instead the court instructed the jury on informed consent as follows:

*"Instruction No. 9*

"For a patient's consent to be effective, whether expressed or implied, the physician must have informed the patient as to the nature of the ailment, the nature of the operation, the alternative treatment available, if any, and the substantial risks, if any, involved in undergoing the operation or the alternative treatment, to the extent that a reasonable medical practitioner would have done under the same or similar circumstances."[3]

2. Dr. Murray testified at trial that he had told Mr. Bloskas that "our group" or "we" had performed an ankle replacement in the past. Dr. Murray's nurse, who was present when the doctor and the plaintiffs discussed ankle replacement as an alternative to fusion, testified that the doctor made it clear to the plaintiffs that he had successfully performed many artificial joint procedures and, further, that the patient upon whom "they" had performed a total ankle replacement was doing well at that time.

3. The trial of their case occurred in October 1978 and Instruction No. 9 was almost identical to *Colo.J.I.* (Civil) 15:11, which stated:

"For a patient's consent to be effective, whether express or implied, the physician must have informed the patient as to the nature of the ailment, the nature of the (operation) (treatment) and the substantial risks, if any, involved in undergoing the (operation) (treatment), to the extent that a reasonable medical practitioner would have done under the same or similar circumstances."

The Colorado Jury Instructions on informed consent were amended in 1980, subsequent to the trial of this case. *See Colo.J.I.2d* (Civil) 15:16.

"Instruction No. 10

"A substantial risk is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure."

The plaintiffs also tendered several instructions on negligent misrepresentation. *See Restatement (Second) of Torts § 311 (1965).* The court rejected these instructions and submitted the case to the jury only on the plaintiffs' claim for lack of informed consent. The jury returned a verdict for the defendant and the Court of Appeals affirmed the judgment.

## II.

We first consider the plaintiffs' contentions with respect to their claim based on lack of informed consent. The plaintiffs raise three asserted errors: (1) the court erred in admitting evidence of the defendant's routine practice of advising patients of risks associated with other joint replacement procedures; (2) the court erroneously denied the plaintiffs' motion for a directed verdict at the conclusion of the evidence; and (3) the court's instructions on informed consent improperly omitted any duty to warn of "special risks" incident to ankle replacement surgery.

## A.

The plaintiffs argue that the admission into evidence of Dr. Murray's habit or custom of routinely advising patients about to undergo hip or knee replacement surgery of the risks of infection and loosening of the artificial joint constituted error. We disagree.

■ Evidence regarding a person's habit or routine practice traditionally has been admissible as relevant to whether the person acted in conformity with the habit or routine practice. *See generally, C.*

McCormick, Evidence § 195 (E. Cleary 2d ed. 1972). "[I]n case of doubt as to what a person has done, it may be considered more probable that he has done what he has been in the habit of doing, than that he acted otherwise." *Denver Tramway Co. v. Owens,* 20 Colo. 107, 124, 36 P. 848, 854 (1894).[4] As is the case with any relevant evidence, the trial court has the discretion to exclude evidence of a routine practice if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues, or if it likely would mislead the jury. *E.g., People v. Madson,* Colo., 638 P.2d 18 (1981); *C. McCormick, supra* § 185; *see* C.R.E. 403.

■ In this case Dr. Murray admitted that he had no independent recollection of advising Mr. Bloskas of the risks of ankle replacement surgery. His testimony about his routine practice was not offered or admitted as substantive evidence of the community standard of informed consent for ankle replacement surgery. Rather, it was admitted as circumstantial evidence that, consistent with Dr. Murray's routine practice in other types of joint replacement surgery, he did give Mr. Bloskas a pre-surgical warning of risks. Considering the limited probative value of this testimony, the danger of the jury being prejudiced, confused or misled by this evidence was minimal. Under these circumstances we cannot say that the admission of this evidence constituted reversible error.

## B.

The plaintiffs argue that they were entitled to a directed verdict on their claim for lack of informed consent because Dr. Murray offered no evidence that whatever warning he did give to Mr. Bloskas conformed to community medical standards on informed consent. We are not persuaded by the plaintiffs' argument.

4. C.R.E. 406, which became effective January 1, 1980, provides:

"Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

In passing upon a motion for a directed verdict, the trial court must view the evidence in the light most favorable to the party against whom the motion is directed. *E.g., Safeway Stores, Inc. v. Langdon*, 187 Colo. 425, 532 P.2d 337 (1975); *Nettrour v. J. C. Penney Co.*, 146 Colo. 150, 360 P.2d 964 (1961); *Gossard v. Watson*, 122 Colo. 271, 221 P.2d 353 (1950). There was circumstantial evidence in this case that Dr. Murray informed Mr. Bloskas of the usual risks associated with joint replacement surgery, namely, the risks of infection and of joint loosening. There also was opinion testimony by both Dr. Murray and his partner that such a warning would comply with community standards for an informed consent in ankle replacement surgery. The issues centering on whether Dr. Murray warned Mr. Bloskas and, if so, whether his warning conformed to the appropriate standard for informed consent were disputed factual questions for the jury to resolve. Accordingly, the trial court properly denied the plaintiffs' motion for a directed verdict.

### C.

We next consider the propriety of the trial court's instructions on informed consent. Relying on *Mallett v. Pirkey*, 171 Colo. 271, 466 P.2d 466 (1970), the plaintiffs assert that the trial court's instruction erroneously limited the defendant's duty to warn to "substantial risks" of the ankle replacement surgery and, in this respect, the instruction was flawed because the duty to warn extends also to "special risks" of the surgical procedure. We reject the plaintiffs' argument.

In *Mallett*, a minor by his mother and next friend sued a surgeon for vision loss resulting from an injection of drugs into the tonsil fossae immediately after a tonsillectomy. The plaintiff claimed lack of informed consent based on the defendant's failure to disclose the risks and hazards of the injection procedure. The trial court instructed the jury on the physician's duty to "generally inform his patient as to the procedures to be followed and the risks involved therein," and, by separate instruction, told the jury of the physician's duty to inform the plaintiff of any substantial risk of the injection procedure. In affirming the judgment for the defendant, we approved the trial court's instructions on informed consent because collectively they stated

> "that a physician has the affirmative duty to inform a patient about to undergo surgery in a general way as to the procedures he will follow and the risks involved in those procedures; he also has a duty to inform a patient of any substantial risk of a procedure which he is to perform and of specific risks, if such risks are known or ought to be known by him." 171 Colo. at 285, 466 P.2d at 473.

On the basis of the above quotation from *Mallett* the plaintiffs argue that the trial court was required to instruct the jury of the physician's duty to warn not only of "substantial risks," as determined by the community standard of informed consent disclosure, but also of any "special risks" over and above those which the medical community deems "substantial," as long as these "special risks" are known or ought to have been known by the physician.[5] We believe the plaintiffs misapprehend the thrust of the *Mallett* decision.

The discussion of risks in *Mallett* took place in the broad context of the informed consent doctrine. We there stated:

> "'This rule [of informed consent] in effect compels disclosure by the physician in order to assure that an informed consent of the patient is obtained. The duty

5. In this case the plaintiffs characterize as special risks the following: the uncertainty of the long-range effect of ankle replacement surgery, the greater risk of infection in an ankle replacement than in an alternative procedure such as fusion, the decreased chance of a successful fusion upon the failure of an ankle replacement due to joint infection, and the risk of amputation in the event of a post-operative fusion failure. Although the plaintiffs' expert witnesses testified that these risks should be disclosed to a patient about to undergo ankle replacement surgery, the plaintiffs offer no principled basis on which to distinguish these risks from the "substantial risks" defined in jury instruction No. 10.

of the physician to disclose, however, is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances. How the physician may best discharge his obligation to the patient in this difficult situation involves primarily a question of medical judgment.'" 171 Colo. at 285, 466 P.2d at 473 (quoting *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093 (1960)). Risks may arise from many sources. By its very nature a surgical procedure always entails some risk. Risks also may arise from the particular circumstances of the patient. While it is impossible for a physician to advise a patient of all conceivable risks, *Mallett* recognizes that where the risk is one which would be medically significant to the patient's surgical decision, and the risk is known or ought to be known by the physician, then it is a "substantial" risk and should be disclosed to the patient. *Mallett* also makes clear that the substantiality of a particular risk must be determined on the basis of expert medical testimony.[6] In our view, *Mallett's* passing reference to "specific risks" was not intended to create a discrete legal subclass of risks within the informed consent doctrine.

■ What is critical to the physician's duty to warn is not whether the risk is common to all medical or surgical procedures of the same general class, nor whether the risk is unique to the particular procedure in question, nor whether its origin lies in the medical condition of the patient or in the execution of the procedure or both. Rather, what is determinative of the physician's duty to warn is the significance of the risk to the patient's informed decision to submit to the medical procedure in question. If the physician, as a reasonable medical practitioner, knew or should have known that an awareness of a particular risk would be a significant factor in the patient's decision to submit to a particular surgical procedure, then the risk is a substantial one which the physician must communicate to the patient.

In this case the trial court described the physician's duty to warn as extending to the nature of the surgery, the alternative treatment available, and the substantial risks arising from the surgery or alternative treatment. By separate instruction the jury was basically informed that substantial risks are those which a physician knows or ought to know would be significant to a patient's decision whether or not to submit to a surgical procedure. These instructions adequately conveyed to the jury the principles applicable to the plaintiffs' claim based on lack of informed consent. We therefore agree with the Court of Appeals' conclusion that no further instructions were required on this facet of the case.[7]

### III.

We turn now to the trial court's refusal to instruct the jury on negligent misrepresentation. The Court of Appeals affirmed the trial court's rejection of the tendered instruction on negligent misrepresentation because "any actions by defendant which would constitute negligent misrepresentation would fall under the doctrines of informed consent or medical malpractice...." In our view, the plaintiffs' claim for negligent misrepresentation was not subsumed by the doctrines of informed

6. Once there is evidence indicating the patient was uninformed because of nondisclosure, *Mallett* imposes on the physician the burden of demonstrating "that his silence did comply with medical standards under the facts facing him ...." 171 Colo. at 282, 466 P.2d at 471; *see also Martin v. Bralliar*, 36 Colo.App. 254, 540 P.2d 1118 (1975); *Short v. Downs*, 36 Colo. App. 109, 537 P.2d 754 (1975).

7. We are aware that *Colo.J.I.2d* (Civil) 15:16, which was adopted subsequent to the trial of this case, describes the information required to be disclosed to a patient as follows: the notice of the ailment, the nature of the procedure, the substantial risks involved in the procedure, the "special risks of harm which he knows or reasonably should have known," and any alternative methods of treatment, to the extent that a reasonable physician practicing in the same field of practice at the same time would have informed the patient. We believe the reference to "special risks" adds nothing to the physician's duty of disclosure as otherwise defined in the instruction and is a potential source of confusion for the jury.

consent or medical malpractice and, since the evidence presented at the trial established a prima facie case of negligent misrepresentation, the trial court erred in failing to instruct the jury on that theory of liability.

■■■ The historical basis of the doctrine of informed consent is the physician's avoidance of liability for battery resulting from the performance of a medical or surgical procedure on a patient. A physician who operates on a patient's body without the patient's consent, or who performs an operation different from that to which the patient consented, commits a battery and is liable for damages resulting therefrom, notwithstanding the exercise of reasonable care in performing the operative procedure. *See, e.g., Maercklein v. Smith*, 129 Colo. 72, 266 P.2d 1095 (1954); Annot., 56 A.L.R.2d 695, 697 (1957); *W. Prosser, Handbook on the Law of Torts* § 16 at 102–103 (4th ed. 1971). Where a patient consents to a surgical procedure but is uninformed about the risks of the surgery, the physician nevertheless may be liable in damages resulting from the patient's lack of informed consent to the surgery. As previously discussed, Part II C, *supra*, the law imposes upon the physician the duty of disclosing to the patient certain information essential to the patient's "informed consent" to a particular surgical procedure. In informed consent cases the physician's duty to warn has evolved as a variant of medical malpractice. *See Stauffer v. Karabin*, 30 Colo.App. 357, 492 P.2d 862 (1971). The precise scope of the physician's duty of disclosure is determined on the basis of expert testimony demonstrating the extent of information given by reasonably careful physicians practicing the same specialty in the same or similar community. *E.g., Mallett v. Pirkey, supra; Martin v. Bralliar*, 36 Colo.App. 254, 540 P.2d 1118 (1975); *Short v. Downs*, 36 Colo.App. 109, 537 P.2d 754 (1975). In a similar vein, a claim in medical malpractice requires proof that the physician failed to exercise that degree of knowledge, skill and care used by other physicians practicing the same specialty. *See, e.g., Artist v. Butterweck*, 162 Colo. 365, 426 P.2d 559 (1967);

*Foose v. Haymond*, 135 Colo. 275, 310 P.2d 722 (1957).

■■■ The tort of negligent misrepresentation provides a remedy for false information negligently given a person who relies to his detriment thereon. Section 311 of the *Restatement (Second) of Torts* sets forth the elements of the claim:

"Negligent Misrepresentation Involving Risk of Physical Harm

"(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results (a) to the other, or (b) to such third persons as the actor should expect to be put in peril by the action taken.

"(2) Such negligence may consist of failure to exercise reasonable care (a) in ascertaining the accuracy of the information, or (b) in the manner in which it is communicated."

Although not depending upon the existence of a professional relationship nor upon expert testimony establishing a professional standard of care, the liability principles of negligent misrepresentation find particular application in those situations where "it is part of the actor's business or profession to give information upon which the safety of the recipient or a third person depends." *Restatement (Second) of Torts* § 311, Comment a.

The doctrine of negligent misrepresentation has been recognized by Colorado courts in cases involving money losses in business transactions, *e.g., Fitzgerald v. Edelen*, Colo.App., 623 P.2d 418 (1980); *First National Bank in Lamar v. Collins*, Colo.App., 616 P.2d 154 (1980), and we see no reason not to extend it to representations made in the course of the professional relationship existing here. A patient often has little choice but to rely upon the representations and assurances of his physician in matters of personal medical concern. That a physician may have complied with professional community standards of disclosure for a particular procedure is not to say that the

physician should not be liable for negligently misrepresenting facts which are extrinsic to his duty to warn but which nonetheless influence the patient's decision about treatment. Nor does it follow that merely because a physician may apply the degree of knowledge, skill and care as is used by other physicians practicing the same specialty, the physician thereby has discharged his full responsibility to the patient. In short, we know of no reason to deny relief when a physician negligently conveys false information to the patient, and the patient relies upon the information to his physical harm.

■ Turning to this case, which was tried solely on the liability theories of lack of informed consent and negligent misrepresentation, it is apparent that there was sufficient evidence in the record to submit the issue of negligent misrepresentation to the jury and that the plaintiffs could have prevailed on that theory notwithstanding the jury's resolution of the informed consent issue. The record establishes that Dr. Murray told Mr. Bloskas that he, as a member of his medical group, had participated in ankle replacement surgery when in fact he had never previously performed such an operation. Further, there is evidence that Mr. Bloskas consented to the ankle replacement only after Dr. Murray assured him and his wife that their concern about the possibility of amputation was unfounded. The jury could well have concluded that, because amputation was not a "substantial risk" of the ankle replacement procedure, Dr. Murray had not breached his legal duty to his patient under the informed consent theory of liability. However, notwithstanding this determination, there was sufficient evidence for the jury to conclude that Dr. Murray negligently misrepresented his pri-

or experience in ankle replacement surgery and the non-risk of amputation from such a surgery, and that Mr. Bloskas reasonably relied upon these representations in consenting to the ankle replacement operation which ultimately led to the loss of his leg. Accordingly, a new trial is required on the plaintiffs' claim for negligent misrepresentation.

We affirm that part of the judgment upholding the verdict for the defendant on the plaintiffs' claim for lack of informed consent. We reverse that part of the judgment relating to the plaintiffs' claim for negligent misrepresentation and we remand the case to the Court of Appeals with directions to return the case to the district court for a new trial on that claim.

HODGES, C. J., and ROVIRA, J., concur in part and dissent in part.

ROVIRA, Justice, concurring in part and dissenting in part:

I concur with the court's opinion except as to Part III which holds that negligent misrepresentation is not subsumed within the doctrine of informed consent, and that the doctrine of informed consent is not coextensive with negligent misrepresentation.

In my opinion, the tort of negligent misrepresentation should not be applied along with the doctrine of informed consent. A close examination of the elements of negligent misrepresentation as set forth in the Restatement (Second) of Torts § 311 (1965),[1] and the jury instruction dealing with informed consent[2] reflect that negligent misrepresentation is subsumed within the requirement of informed consent.

The informed consent instruction implicitly assumes that the information given to

1. Restatement (Second) of Torts § 311 provides in pertinent part:
    "Negligent Misrepresentation Involving Risk of Physical Harm
    (1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results
        (a) to the other . . . ."

2. "For a patient's consent to be effective, whether expressed or implied, the physician must have informed the patient as to the nature of the ailment, the nature of the operation, the alternative treatment available, if any, and the substantial risks, if any, involved in undergoing the operation or the alternative treatment, to the extent that a reasonable medical practitioner would have done under the same or similar circumstances."

the patient is true and not false, and requires the physician to inform the patient of the "substantial risks, if any, involved in undergoing the operation...."

In this case, if the possibility of amputation was a substantial risk of the operation and if Dr. Murray did not inform his patient of this risk or negligently gave him false information, he would have failed to meet the requirement of obtaining informed consent. Also, if the statement by Dr. Murray concerning his experience in doing ankle replacements was false and such false statement added to the risk of the operation and misled his patient, he again would have failed to obtain an informed consent.

The law of informed consent imposes on a physician the obligation to obtain his patient's informed consent prior to surgery. If false information is negligently given by the physician and the patient relies on it, then clearly the patient has not given an informed consent.

The court's opinion vitiates the limitations of, and protections developed under, the doctrine of informed consent. It exposes medical practitioners to liability without the protection of the "reasonable medical practitioner" standard, an important part of the doctrine of informed consent.

I cannot agree with the statement endorsed by the majority that although a physician may have complied with professional community standards of disclosure, nevertheless, he may still be liable for negligently misrepresenting facts which are "extrinsic to his duty to warn." Nor do I agree with the sweeping generalization that a physician who applies the same "degree of knowledge, skill and care as is used by other physicians practicing the same specialty" may still be liable in damages because he has not discharged his full responsibility to the patient. These statements support the conclusion that even though a physician has measured up to the standard of reasonable medical practice in his community he may still be liable in damages. In effect, recovery by the patient is permitted whenever the result is not what the patient expected or hoped for.

The majority opinion fails to cite any authority to support its decision to impose the doctrine of negligent misrepresentation on top of the doctrine of implied consent. While such a failure does not, in and of itself, demonstrate the error of its decision, it reinforces my view that we should act with restraint in imposing additional theories of liability on those engaged in the healing arts.

I am authorized to say that Chief Justice HODGES joins in this dissent.