No. 22600.

PATRICK MALLETT, BY AND THROUGH HIS NEXT FRIEND, JAMES MALLETT *v.* WILL PIRKEY.
(466 P.2d 466)

Decided March 16, 1970. Rehearing denied April 6, 1970.

KRIPKE, HOFFMAN, CARRIGAN and DUFTY, DANIEL S. HOFFMAN, for plaintiff in error.

WORMWOOD, WOLVINGTON, RENNER & DOSH, WINSTON W. WOLVINGTON, for defendant in error.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

PATRICK MALLETT, a minor, through his father James Mallett, as next friend, was plaintiff in the trial court. Dr. Will Pirkey was defendant. The action was based on allegations of professional negligence by defendant. The jury returned a verdict for the defendant.

Plaintiff alleged that he sustained permanent eyesight injury, with vision loss and central nervous system injury, plus severe emotional disturbances as a result of a tonsillectomy and adenoidectomy performed upon him by defendant, Dr. Pirkey. His claim against Dr. Pirkey is based on three negligence theories — res ipsa loquitur, general negligence, and a lack of informed consent. Dr. Pirkey's answer included a general denial of the allegations and his third defense alleged that the damages complained of by plaintiff were not proximately caused by any negligence on the part of defendant, but are the proximate result of claimant's condition, unrelated to any acts of the defendant.

For an understanding of our decision in this case it is necessary to relate the facts in considerable detail.

Plaintiff was a normal six-year old child at the time of the surgery in question. His pediatrician had recommended the removal of his tonsils and adenoids because he had suffered repeated throat and ear infections. Patrick's pediatrician recommended Dr. Pirkey to Mrs. Mallett.

Dr. Pirkey is a physician duly licensed to practice in Colorado, specializing in otolaryngology with subspecialties in microsurgery. He has been practicing for 23 years and is Board Certified through national examination in his specialty.

Dr. Pirkey performed tonsillectomies on the same day on Patrick and his two brothers. The surgical procedure was the same for all, and Patrick's brothers suffered no unusual effects. However, when Patrick awoke from the anesthetic after surgery, he related to his mother, a registered nurse, who was at his bedside, that he could not see. Mrs. Mallett testified that she relied on her own

experience and therefore assumed that Patrick had received scopolamine or atropine as a preoperative drug and was suffering "blurred vision" as a temporary reaction. She took him home from the hospital the next day. She did not report his loss of vision to Dr. Pirkey until approximately one week after the operation when Patrick was taken to the doctor's office for a routine post-operative examination. Mrs. Mallett then for the first time related to the doctor all of the symptoms which had occurred after surgery which indicated that Patrick was not able to see properly. Dr. Pirkey immediately arranged for the child to be seen by an ophthalmologist who sent Patrick to the hospital for treatment, with no marked success. Patrick's sight remains seriously impaired. His visual difficulties are permanent and cannot be improved with the use of corrective lenses.

The allegations of negligence against the defendant pertain to the use of an injection procedure after the removal of plaintiff's tonsils. A combination of three drugs — depo-medrol, xylocaine, and penicillin — was injected into the tonsil fossae immediately following the removal of his tonsils. It is not disputed that plaintiff suffered severe impairment of vision. What is in dispute is the cause of the visual impairment and defendant's liability for the injury.

### PLAINTIFF'S CASE IN THE TRIAL COURT

Plaintiff established that the injection procedure used by Dr. Pirkey as part of the tonsillectomy procedure is not used by any other doctor in the Denver area. It is used at some university medical centers in other states and it is being used in some cities in the United States. It does not have nation-wide prevalence. There was introduced into evidence three medical articles written by innovators of the procedure — including Dr. James T. King, of Atlanta, Georgia — which discuss the procedure and the results of its use. Dr. King also testified as an expert witness for Dr. Pirkey.

Five potential dangers in the procedure were outlined

in Dr. King's paper. The greatest peril was hemorrhage caused by damage to the internal carotid artery and/or intra-arterial injection. Another peril was said to be allergic or toxic reaction.

Plaintiff's evidence reflects that defendant did not discuss the risks and hazards of the injection procedure with Patrick's parents prior to the tonsillectomy. The testimony is that he discussed the risks of the tonsillectomy generally — the general danger associated with a general anesthetic, the danger of bleeding immediately post-operatively and the danger of late bleeding. Mrs. Mallett testified that she was aware generally of the risks associated with a tonsillectomy but had never heard of the injection technique; nor was she aware of the risk of partial blindness.

Mrs. Mallett signed a "Consent to Operation and Anesthesia" form. It read in part: 2. The nature and purpose of the operation, possible alternative methods of treatment, the risks involved, and the possibility of complications have been fully explained to me. I acknowledge that no guarantee or assurance has been made as to the results that may be obtained."

Over objection, plaintiff produced a witness — Lyn Lipscomb — who testified that she had undergone a tonsillectomy, including the injection procedure, performed by Dr. Pirkey previous to the time of plaintiff's tonsillectomy. She too had experienced visual impairment after the surgery, and she still has blind spots. Her visual difficulties are not of the same severity as those of the plaintiff. She testified that she visited the defendant 11 days before the Patrick Mallett surgery, at which time she complained of her impaired vision. Dr. William Tandy, a qualified physician, who was treating Miss Lipscomb, was also permitted to give his opinion through a deposition that Miss Lipscomb has permanent visual damage which "arose as a result of the injection after the tonsils were removed by this combination of depomedrol, penicillin, and xylocaine entering the internal

carotid artery and going from there through the ophthalmic artery to the retinal artery." He testified that it was his judgment that the specific mechanism of injury in the cases of Miss Lipscomb and Patrick Mallett was the passing of the combined drugs into the blood stream by injection through the internal carotid artery to the much smaller retinal artery resulting in the blood supply blockage in the retinal artery. Dr. Tandy testified that there are several risks involved in the procedure including the risk of injection into an artery and that in his opinion the risks do not justify the procedure; nor did he believe that the procedure is routine or accepted in the general medical community. In his opinion any use of the procedure would require an explanation of risks and benefits to the parents of a minor child.

Dr. John C. Long, one of the physicians who examined the plaintiff postoperatively, also was a plaintiff's witness who testified that one could not be certain of the cause of Patrick's difficulty but that his *conjectural* opinion Patrick's partial blindness was the result of a cutting off of the blood supply to the retinal arteries *in some way.* In such a case he stated that it would be important to institute medical corrective procedures promptly.

### DEFENDANT'S CASE IN THE TRIAL COURT

The testimony of Dr. Pirkey and the expert witness, Dr. King, one of the innovators of the new technique, brought out that the purpose of using the procedure was for the benefit of the patient, to reduce postoperative bleeding, the chance of infection, and to alleviate pain.

Dr. Pirkey testified that the injection procedure in question was first brought to his attention at a meeting of the American Academy of Ophthalmology and Otolaryngology in Chicago. It had been tested in 3803 cases without any serious complication before he used it. He himself had performed 14,000 tonsillectomies in his practice and had used the injection procedure somewhere between 110 and 120 times before he operated on Patrick and his brothers. Regarding the case of Miss Lipscomb,

Dr. Pirkey stated that at the time he operated on Patrick he did not associate the visual problem of Miss Libscomb with the procedure and did not know that Miss Lipscomb's condition was of a permanent nature.

Defendant's evidence established that the first notice Dr. Pirkey had of Patrick's visual difficulties was at the time of the postoperative visit to his office.

Defendant testified that he had not injected the medicine into the carotid artery on either side, and there was testimony by the anesthesiologist who assisted him at the operation that no such injection into the carotid artery was made. The transcript contains a detailed description of the effect of injection into an artery which it is not necessary to repeat except to state that there was no evidence introduced that Dr. Pirkey had in fact injected into the carotid artery.

There was testimony that it is accepted medical practice to check for allergy to penicillin simply by asking about past history, and that Mrs. Mallett reported that Patrick had taken penicillin with no allergic effects previously. She also reported to the intern who took Patrick's history before surgery that he had no other known allergies.

Defendant's witness, Dr. King, testified as to the injection procedure. He is a highly qualified physician who has been practicing in Atlanta, Georgia, for 20 years, specializing in ear and throat. He had personally used the procedure in 1086 cases and participated in a controlled study involving 192 patients. He gave his opinion that the result in those cases in which he used the injection procedure was that there was much less secondary bleeding, better healing, and more comfort. He never had a patient who had difficulty with his eyesight after the procedure. He testified that he wrote an article about the dangers of the procedure because he

"* * * considered this a major improvement in the method of taking care of these patients' operations and I was afraid that it would be so enthusiastically received that people who were perhaps not well enough qualified

might try this and have some trouble and this article was directed towards that."

Dr. King testified that he did not consider the injection procedure to be in the experimental stage, and considered it to be an accepted national standard. He testified that he does not discuss with his patients whether or not he is going to utilize this procedure. The witness did not know the cause of the visual difficulties of Patrick Mallett and Lyn Lipscomb.

Dr. Pirkey gave his opinion and conclusion at the time of the trial that the cause of the loss of sight in his two patients was a retinal vascular spasm. He testified that the two incidents were probably caused by a "reaction and idiosyncrasy, either in the enzyme material * * * in their own body or in the medicine used."

## THE VERDICT

Trial was to a jury of six. At the conclusion of the plaintiff's evidence and again at the end of all the evidence, the defendant moved for a judgment of dismissal of all three claims. All of his motions were overruled and the case was submitted to the jury.

The plaintiff requests this court: I. To grant a new trial on damages alone and to direct entry of judgment for plaintiff on liability as a matter of law, or II. In the alternative, he seeks a new trial on all issues, with guidelines for proper instructions.

■ We hold that the case was properly submitted to the jury on highly conflicting questions of fact and opinion evidence and that the instructions were not prejudicially erroneous. Accordingly, we affirm.

## I.

On the question of whether the court should have held the defendant liable as a matter of law, the plaintiff argues that the evidence clearly focused on the issue of a lack of "informed consent" and was not such as to present a jury question on this issue. It is argued that the procedure used is of recent origin, sparse utilization, and is under study at university medical centers. More-

over, it is alleged that the procedure has risks and perils as emphasized by the medical literature. It is contended that Dr. Pirkey was put on notice of the risk of blindness by use of the injection procedure because a previous patient had suffered partial loss of vision after the procedure had been used on her. It is further urged that the risks of the injection procedure were much greater than the risks of a tonsillectomy without the use of the procedure. For all these reasons it is asserted that the plaintiff's parents did not give an informed consent to the use of this procedure on their son since they were not even told that the procedure would be used, let alone of any of the risks involved.

All of the plaintiff's arguments were premised on the proposition that Dr. Pirkey knew or should have known that the injection procedure was hazardous, and the further assumption that he should have enumerated the risks and hazards to Mrs. Mallett in obtaining her signed consent. However, the testimony of Dr. Pirkey and of Dr. King was that the procedure had been used successfully over 3000 times with no serious problems arising from its use. The medical literature did not reveal *any* serious complication in its use. Nothing about possible visual difficulties was set forth as among the probable side effects. Dr. King testified that the most striking benefit from the use of the procedure was the dramatic decrease in bleeding that occurs in the week following the operation which he explained was caused by secondary infection of the throat. The next benefit he outlined was that healing was accelerated by this treatment; and last, he noted that the patient was made more comfortable.

 Plaintiff relies on Dr. King's article, Exhibit B, as being proof that the procedure was known to have serious risks. However, as Dr. King himself explained — and a reading of the article bears him out — it sets out dangers in the procedure if not done properly. It does not imply that the procedure itself is improper. From the data presented by the articles in the medical journals and from

Dr. King's testimony, the jury could conclude that this was now a safe and proper procedure involving little if any known risk if properly performed. A doctor does not have a duty to disclose the risks of the improper performance of an appropriate procedure. *See Mull v. Emory University, Inc.,* 114 Go. App. 63, 150 S.E.2d 276.

If this procedure were found by the jury to be appropriate — beneficial and with no known serious complications — the question of informed consent would not even be an issue in the case. All of the cases cited by plaintiff which explain the informed consent doctrine are concerned with instances of performance of treatments recognized to have inherent and probable substantial risks associated with them. *Salgo v. Stanford,* 154 Cal. App.2d 560, 317 P.2d 170 (a translumbar aortography); *Natanson v. Kline,* 186 Kan. 393, 350 P.2d 1093, 187 Kan. 186, 354 P.2d 670 (cobalt x-ray therapy); *Mitchell v. Robinson,* 334 S.W.2d 11 (Mo) (electro-shock and insulin therapy); *Fiorentino v. Wenger,* 26 App. Div.2d 693, 272 N.Y.S.2d 557, a surgical procedure used only by defendant which had caused five untoward results and been barred from use in one hospital; *DiRosse v. Wein,* 24 App.Div.2d 510, 261 N.Y.S.2d 623 (gold therapy); *Scott v. Wilson,* 396 S.W.2d 532 (Tex.) (a stapedectomy).

Plaintiff was permitted to introduce evidence of the injury to Miss Lipscomb for the purpose of establishing that the defendant had notice of the hazards of this procedure. However, the defendant disputed that he was, by her visit to his office 11 days prior to the surgery on the Mallett boys, put on notice, since at that time he had no reason to and did not, in fact, connect her partial loss of sight to the injection procedure. It was, therefore, a jury question whether defendant knew or should have known of the risk of blindness associated with the injection procedure. And, assuming arguendo that Dr. Pirkey should have known of the risk of the injection procedure, there was still the question as to

how detailed and in what depth a doctor must inform his patient — or in this case the patient's parents. In the original opinion of *Natanson v. Kline, supra,* it was said that the plaintiff would not be required to produce expert evidence to establish that the doctor's silence deviated from the accepted practice. Therefore, it would seem to follow that the burden is on the physician to go forward to show that his silence did comply with medical standards under the facts facing him because in this connection the court, when it expanded upon its original opinion in the second *Natanson* case, explained that:

"Conceivably, in a given case as indicated in the opinion, no disclosures to a patient may be justified where such practice, under given facts and circumstances, is established by expert testimony to be in accordance with that of a reasonable medical practitioner under the same or similar circumstances. * * *"

In the case at bar the plaintiff urged, and the trial court accepted, the view that the standard of care required of a physician performing tonsillectomies is to be determined by national standards—thus the opinions of Dr. King, from Georgia, and Dr. Tandy, of California, were offered and accepted in this area and differed sharply. Dr. King testified that he never informs his patients that he will use the injection procedure when performing a tonsillectomy. Dr. Tandy, on the other hand, testified that in his opinion a patient should be informed of the risks of the injection procedure. With the conflicting evidence of the two doctors in the record, the court could not determine the question as a matter of law, so it was not error to submit the matter to the jury. *See* generally, *Louisell and Williams,* 2 *Medical Malpractice* § 22.03 at 594.48.

Plaintiff, however, advances the argument that the procedure in question was unapproved and experimental, a factor which in itself required disclosure by the phy-

sician. He cites *Jackson v. Burnham,* 20 Colo. 532, 39 P. 577, wherein this court stated:

"* * * There must be some criterion by which to test the proper mode of treatment in a given case, and when a particular mode of treatment is upheld by a consensus of opinion among the members of a profession, it should be followed by the ordinary practitioner; and, if a physician sees fit to experiment with some other mode, he should do so at his peril. * * *"

But the holding in *Jackson* was that the question of the proper mode of treatment was a matter for the jury's determination. On this the court said:

"In other words, he [the physician] must be able, in the case of deleterious results, to *satisfy the jury* that he had reason for the faith that was in him and justify his experiment by some reasonable theory." (Emphasis added.)

The court further explained, quoting from *Carpenter v. Blake,* 60 Barb. 488 (N.Y.) — which also was a jury case:

"Some standard, by which to determine the propriety of treatment, must be adopted; otherwise experiment will take the place of skill, and the reckless experimentalist the place of the educated, experienced practitioner. * * * [W]hen the case is one as to which a system of treatment has been followed for a long time, there should be no departure from . it, unless the surgeon who does it is prepared to take the risk of establishing, by his success, the propriety and safety of his experiment. .

"The rule protects the community against reckless experiments, while it admits the adoption of new remedies and modes of treatment only when their benefits have been demonstrated, or when, from the necessity of the case, the surgeon or physician must be left to the exercise of his own skill and experience."

In the case at bar Dr. Pirkey and Dr. King testified that the procedure in question had been shown to be of great benefit in conjunction with a tonsillectomy.

It was for the jury, under the evidence, to determine whether the benefits of the procedure had been demonstrated.

## II.

■ We come now to plaintiff's contention that the instructions given by the court do not collectively state the proper law. The plaintiff argues that the trial court committed prejudicial error by giving multiple, confusing, contradictory and erroneous instructions on the vital issue of "lack of informed consent."

The instructions in question are numbers 15, 16, and 20.

### "INSTRUCTION NO. 15

You are instructed that a physician is not required to detail to his patient all of the details of the procedures he will follow in surgery and all of the specific dangers that are involved in surgical procedures. It is sufficient that the physician generally inform his patient as to the procedures to be followed and the risks involved therein."

### "INSTRUCTION NO. 16

The Court instructs you there has been evidence in this case that Jean Mallett, the mother of the plaintiff, Patrick Mallett, executed a consent to surgery form relating to the tonsillectomy of June 14, 1965, but that such consent is not available as a defense on behalf of the defendant, Will Pirkey, if, in fact, you find by a preponderance of the evidence that the eye injury sustained by the plaintiff, Patrick Mallett, if as a proximate result of the injective procedure used by the defendant, Will Pirkey, was a substantial risk of said procedure and that the defendant, Will Pirkey, failed to inform Patrick Mallett's mother of such risks and that Patrick Mallett's mother did not know nor should have known of said risks and that there was no present emergency requiring the use of said injective procedure and that Patrick Mallett's mother would not have executed such a consent form had the risk been explained to her."

### "INSTRUCTION NO. 20

You are instructed that the duty of a physician to inform

his patients as to the procedures to be followed and the risks involved therein is the duty to inform such patient of the risks that are known or ought to have been known to the physician. The physician is not liable for injuries and damages arising from risks or dangers which were not known to him and about which he could not reasonably have known."

The instructions collectively state that a physician has the affirmative duty to inform a patient about to undergo surgery in a general way as to the procedures he will follow and the risks involved in those procedures; he also has a duty to inform a patient of any substantial risk of a procedure which he is to perform and of specific risks, if such risks are known or ought to be known by him.

These instructions are consistent with the principles enunciated in the cases defining "informed consent" cited by the plaintiff and relied on by him. In *Natanson v. Kline, supra,* the court stated what it considered the rule of informed consent to be:

"\* \* \* This rule in effect compels disclosure by the physician in order to assure that an informed consent of the patient is obtained. The duty of the physician to disclose, however, is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances. How the physician may best discharge his obligation to the patient in this difficult situation involves primarily a question of medical judgment. So long as the disclosure is sufficient to assure an informed consent, the physician's choice of plausible courses should not be called into question if it appears, all circumstances considered, that the physician was motivated only by the patient's best therapeutic interests and he proceeded as competent medical men would have done in a similar situation."

The plaintiff next argues that he pleaded — and the court instructed the jury on — several substantive theories of potential recovery, but the court committed

prejudicial error by "fracturing" and "splinting" each of plaintiff's theories of recovery into multiple, separate instructions which were disordered, confusing, contradictory and misleading when taken as a whole.

We believe this argument to be without merit. There were 22 instructions given by the court in this case. Plaintiff was permitted to present three theories of recovery to the jury, and the court instructed on them in the order in which they appeared in the complaint.

■ The plaintiff's real complaint concerns the order in which the instructions were given rather than the substance of the instructions. This question of the order in which the instructions are given has long since been put at rest by this court. In the case of *Moffatt v. Tenney,* 17 Colo. 189, 30 P. 348, this court said:

"* * * As has been repeatedly held, the duty imposed upon the trial court necessarily involves a large discretion as to the form and style in which instructions to the jury shall be given. Unnecessary instructions do not necessarily make a charge erroneous. Instructions once given in substance need not be repeated. If all proper requests to charge are given in substance, and no instructions are given that are erroneous or misleading, the court must be held to have discharged its duty, and the judgment, if well founded in other respects, should not be disturbed, even though some unnecessary instructions have been given and some correct requests to charge have not been repeated. To hold the trial courts to a stricter rule than this would practically result in overthrowing the judgment in nearly every contested case and would be a clear violation of section 78 of the Code. (Citing cases.)"

■ It can be argued, as plaintiff does here, that the instructions could have been differently arranged. That may well be. However, plaintiff did not complain of the arrangement at the time that the instructions were submitted by the parties and before they were given to the jury as required by R.C.P. Colo. 51.

The judgment is affirmed.

MR. JUSTICE PRINGLE concurs in the result.

MR. JUSTICE KELLEY and MR. JUSTICE LEE not partici-pating.