Edward R. MASTRO, M.D., Petitioner,

v.

Barbara Jean BRODIE, Respondent.

No. 81SC305.

Supreme Court of Colorado,
En Banc.

May 7, 1984.

Rehearing Denied May 29, 1984.

Johnson, Mahoney & Scott, P.C., Paul E. Scott, Brian J. Lampert, Denver, for petitioner.

Spurgeon, Haney & Howbert, P.C., Gregory R. Piché, Colorado Springs, for respondent.

NEIGHBORS, Justice.

We granted certiorari to review the decision of the court of appeals in *Brodie v. Mastro*, 638 P.2d 800 (Colo.App.1981), reversing the order of the district court granting summary judgment to petitioner, Dr. Edward R. Mastro (Mastro), in a medical malpractice action. The court of appeals held that the malpractice claim of respondent, Barbara Jean Brodie (Brodie), was not barred by the applicable statute of limitations. We affirm the judgment of the court of appeals.

1. We express no opinion as to the truth of these facts. Whether Brodie can prove the facts alleged remains to be determined at trial.

2. The surgery was performed without incident, and Brodie returned a few days later to have the stitches removed. She makes no claim that Mastro negligently performed the surgery.

3. *Dorland's Illustrated Medical Dictionary* 695 (26th ed.1981) defines "keloid" as "a sharply

I.

We learn the following facts from Brodie's complaint, deposition, and affidavit filed in opposition to the motion for summary judgment.[1] On February 5, 1977, Mastro surgically removed a small nodule from the back of Brodie's shoulder.[2] He obtained Brodie's consent to the surgery after explaining that she would have a scar, "but it wouldn't be a bad one." Several months later, however, the scar from the surgery became "large, unsightly and uncomfortable." Brodie returned to Mastro in July 1977, but received no further treatment and no explanation of what had happened. He told her only that "there was nothing else he could do about [the scar]." Since that time, Brodie has had no contact with Mastro. She received treatment, including a series of injections into the scar, from two other physicians during the next two years. She also discussed the scar with at least two attorneys for whom she worked during this time period. Her scar, however, has remained approximately the same in size and appearance as when she first became aware of it. In August 1979, a physician at the University of Colorado Medical Center informed Brodie that she had developed a "keloid"[3] on her shoulder. Further, he told her that a surgical procedure on the shoulder of young, dark-skinned individuals frequently results in the formation of a keloid, which, while unpredictable, does occur in a percentage of such patients. He indicated to Brodie's attorney that "the risk of keloid should have been anticipated" and that Mastro should have warned Brodie of such a risk before operating on her shoulder.[4]

Three months later, in November 1979, Brodie filed a complaint against Mastro in

elevated, irregularly-shaped, progressively enlarging scar due to the formation of excessive amounts of collagen [fibrous tissue] ... during connective tissue repair."

4. Brodie is a dark-skinned woman. She described her racial background in her deposition as "half black and half Mexican." Brodie's father had been a patient of Mastro's before her surgery.

the Pueblo County District Court alleging medical malpractice. She claimed that, when she consulted him about the nodule on her shoulder, Mastro knew or should have known of the inherent risk of keloid development in a person with her physical characteristics, and that he knew or should have known that disclosure of this risk "would be of great significance to a person in [Brodie's] position in deciding to submit to surgery." Since Mastro was "under a duty to inform [Brodie] of any substantial or special risks inherent in the procedure," his failure to mention keloid scarring before the surgery prevented her from making "an intelligent choice as to alternative treatments consonant with the underlying premise of informed consent." As a result, Brodie suffered "a serious, permanent disfiguring injury" in the form of "a large, unsightly growth" that was "plainly visible on her shoulder." While admitting that she was aware of the scar by July 1977, Brodie concluded by alleging that she was not aware and could not reasonably have been aware of "[Mastro's] negligence in failing to inform her" of the high risk of keloid formation until she consulted the physician at the medical center in August 1979, at the direction of her attorney.

After depositions of the parties were taken, Mastro filed a motion for summary judgment, claiming that the two-year statute of limitations for medical malpractice actions based on lack of informed consent barred Brodie's claim. *See* section 13–80–105(1), C.R.S.1973 (1983 Supp.).[5] Under this provision, the two-year period begins to run when the injured person discovers or in the exercise of reasonable diligence should have discovered "the injury." Mastro claimed that there was no genuine issue of material fact since Brodie "has admitted that she knew of the injury (unsightly scar) more than two years prior to initiation of her Complaint."

**5.** This statute is discussed in more detail in Part II, *infra.*

**6.** This statute is also discussed in Part II, *infra.* If an act or omission giving rise to a cause of

Brodie filed a memorandum opposing the summary judgment motion. She acknowledged that her "claim in this action is based upon [Mastro's] ... failure to secure her 'informed consent'" before operating on her shoulder. However, she argued that section 13–80–105(1) also contains an exception which, in her view, tolls the two-year statute of limitations if the act or omission giving rise to a cause of action is "knowingly concealed." *See* section 13–80–105(1)(a), C.R.S.1973 (1983 Supp.).[6] Relying on this provision, Brodie argued that Mastro "knowingly concealed" from her the high risk of keloid formation. She stated in her affidavit that she did not learn of the existence of this risk until August 1979, when she consulted the surgeon in Denver about her scar.

The district court granted the motion for summary judgment. It concluded that the two-year statute of limitations began to run no later than July 1977, when Brodie returned to Mastro's office "to complain about the enlarged scar," and expired in July 1979, four months before she filed her complaint. The court explained its decision in terms of when Brodie discovered her "injury":

> "In July, 1977, the scar had achieved such proportions that [she] returned to [see Mastro] because the scar was large, unsightly and uncomfortable. [Brodie] discovered the injury in July, 1977, at the very latest. She was fully aware of it at that point, and its very existence made her cognizant of the risks involved in the February 5, 1977, surgery. She knew that a keloid formation was not only a risk but a reality for shoulder surgery on a young, dark-skinned female."

A divided panel of the Colorado Court of Appeals reversed the judgment of the district court. The majority conceded that, "[i]f the only allegation here was uninformed consent," the two-year statute of limitations in section 13–80–105(1) would

action is "knowingly concealed," the injured person must file the action within two years after he or she discovers or should have discovered "the act or omission."

bar Brodie's action.[7] However, since Brodie also alleged knowing concealment against Mastro, the court decided that the exception provided by section 13–80–105(1)(a) might be applicable to Brodie's action. According to the majority, the issue was whether Mastro knowingly concealed from Brodie the high risk of keloid scarring to one of her skin pigmentation.[8] Since the evidence on this issue was "contradictory," the court concluded that it "should not have been disposed of by summary judgment." *Brodie*, 638 P.2d at 801.[9]

## II.

Brodie's claim for medical malpractice is premised on the theory of lack of informed consent prior to the surgery which occurred on February 5, 1977. Her complaint was not filed until November 19, 1979. Mastro pleaded the affirmative defense of the statute of limitations contained in section 13–80–105, C.R.S.1973 (1983 Supp.). In order to avoid the two-year statute of limitations defense, Brodie relies upon the knowing concealment exception contained in section 13–80–105(1)(a). Thus, the first issue to be resolved is whether knowing concealment is an exception to the two-year statute of limitations.

## A.

Section 13–80–105(1) establishes a two-year statute of limitations for medical malpractice actions based on lack of informed consent. The statute provides:

"No person shall be permitted to maintain an action, whether such action sounds in tort or contract, to recover damages from ... any person licensed in this state ... to practice medicine, ... on account of the alleged negligence, breach of contract, or lack of informed consent of such person in the practice of the profession for which he is licensed ... unless such action is instituted within two years after the person bringing the action discovered, or in the exercise of reasonable diligence and concern should have discovered, the injury. *In no event may such action be instituted more than three years after the act or omission which gave rise thereto, subject to the following exceptions:*"

(Emphasis added.) The underlined language creates a three-year statute of repose, subject to statutory and judicial exceptions. *See Austin v. Litvak*, 682 P.2d 41 (Colo.1984). The exception for knowing concealment in section 13–80–105(1)(a) states:

---

**7.** "If the only allegation here were uninformed consent, we would agree that that portion of the statute is conclusive as it only requires that the patient be aware, or should have become aware of the injury. It is undisputed that her awareness occurred more than two years prior to her filing this lawsuit."
*Brodie v. Mastro*, 638 P.2d 800, 801 (Colo.App. 1981).

**8.** The majority did not elaborate on how or when Mastro may have engaged in knowing concealment. The principal focus of its opinion was that the failure to warn Brodie about the risk of keloid scarring may have constituted knowing concealment, regardless of when the failure to warn took place.

**9.** Judge Coyte, in his dissent, emphasized the distinction between lack of informed consent and knowing concealment:

"The exception to the statute relied upon by the majority, in my view, has no application to the facts in this case. As I read the statute, an action for lack of informed consent is barred if not brought within the two year

period. The exception quoted has application if, *e.g.*, the damaged party, the plaintiff in this case, were to question the surgeon as to the results and then he were to conceal the results of the surgery from the patient. This is what I believe the statute referred to when it states: 'If the act or omission which gave rise to the cause of action was knowingly concealed by the person committing such act or omission.'

"The claim for relief here is that Dr. Mastro did not have plaintiff's informed consent to perform the operation. It would be immaterial if the lack of informed consent resulted from 'knowingly concealing,' not advising or misadvising. Such action would be barred within the two year period 'after the person bringing the action discovered, or in the exercise of reasonable diligence ... should have discovered the injury.'

"Here, plaintiff was fully aware of the results of her surgery in July 1977, when she returned to complain to Dr. Mastro of the results of the surgery. At the time this action was commenced on November 19, 1979, it was barred by § 13–80–105, C.R.S.1973 (1980 Cum.Supp.)."

"If the act or omission which gave rise to the cause of action was knowingly concealed by the person committing such act or omission, ... then such action may be instituted within two years after the person bringing the action discovered, or in the exercise of reasonable diligence and concern should have discovered, the act or omission, ..." [10]

■■■ In construing these provisions, we conclude that a medical malpractice claimant must file an action within two years after he or she "discovered, or in the exercise of reasonable diligence and concern should have discovered, the injury." Section 13–80–105(1). In addition to this period of limitation, the repose provision proscribes the filing of an action more than three years after the act or omission which gave rise to the claim. However, section 13–80–105(1)(a) contains two exceptions to the three-year period of repose. First, the claim is not barred if the person who committed the act or omission knowingly conceals that fact. Second, the claim is excepted from the period of repose if the physician left an unauthorized foreign object in the claimant's body. Under either exception, however, the medical malpractice action must be filed within two years after the plaintiff discovers or should have discovered the defendant's act or omission. We are persuaded that the knowing concealment and foreign object exceptions apply only to the three-year statute of repose and not to the two-year statute of limitations. *See Sanchez v. South Hoover Hospital*, 18 Cal.3d 93, 132 Cal.Rptr. 657, 553 P.2d 1129 (Cal.1976); *Graham v. Hansen*, 128 Cal.App.3d 965, 180 Cal.Rptr. 604 (1982).

■■■ In applying this statutory interpretation to the facts of this case, we hold that the knowing concealment exception is inapplicable. Brodie filed suit against Mastro within three years from February 5, 1977, the date of the act or omission. Thus, her claim is not barred by the three-year statute of repose. We conclude that the pivotal question in this case is whether Brodie filed suit within two years after she "discovered, or in the exercise of reasonable diligence and concern should have discovered, the *injury*." Section 13–80–105(1) (emphasis added). Therefore, we must interpret the word "injury" as it appears in the statute of limitations governing medical malpractice cases.

B.

Section 13–80–105, C.R.S.1973 (1983 Supp.), became effective on July 1, 1977.[11] Before that date, the statute prohibited a person from maintaining a malpractice action sounding in "tort or contract" to be maintained:

"[u]nless such action is instituted within two years after the person bringing the action either discovered or in the exercise of reasonable diligence and concern should have discovered the seriousness and character of his injuries and the negligence or breach of contract which gave rise to such action. In no event may such action be instituted more than six years after the act or omission which gave rise thereto...."

Section 13–80–105, C.R.S.1973. A separate statute, section 13–80–105.5, C.R.S.1973, established another two-year statute of limitations for malpractice actions based on lack of informed consent. The General Assembly repealed section 13–80–105.5, effective July 1, 1977, and inserted lack of informed consent in section 13–80–105. It also deleted the words "seriousness and character of his injuries," "negligence,"

---

**10.** Subsection (a) also contains an exception to the three-year statute of repose where the "act or omission consisted of leaving an unauthorized foreign object in the body of the patient...." The exception provided in subsection (b) applies to actions brought by or on behalf of minors who are under the age of six years on the date of the act or omission. This subsection requires that the case be instituted within two years after the child reaches six years of age.

**11.** *See* An Act Concerning Limitation of Actions, and Relating to the Period During Which a Person May Maintain an Action for Medical Malpractice, Colo.Sess.Laws 1977, ch. 198, 13–80–105(1)(a) at 817.

and "breach of contract," substituted the generic word "injury" which had been used in the informed consent provision, and added the words "act or omission." We view this action by the legislature as an effort to combine a number of complex legal concepts into three legal terms.

### C.

There are at least three possible interpretations of the word "injury": (1) the alleged negligent act or omission; (2) the physical damage or manifestation resulting from the act or omission; or (3) the legal injury, i.e., all the essential elements of a claim for medical malpractice.

At least two courts have adopted the first definition. *See Landgraff v. Wagner*, 26 Ariz.App. 49, 546 P.2d 26 (Ariz.App.), *appeal dismissed*, 429 U.S. 806, 97 S.Ct. 40, 50 L.Ed.2d 67 (1976); *Dunn v. St. Francis Hospital, Inc.*, 401 A.2d 77 (Del. 1979). We reject this interpretation of the word. The legislature clearly intended that the word "injury" have a different meaning than "act or omission" because the three words are each used in the malpractice statute. *See Allen v. Newport*, 427 F.Supp. 42 (M.D.Tenn.1976). A claimant must file suit within two years after discovering the "injury" and, in no event, more than three years after the date of the "act or omission." Moreover, such a construction defeats the purpose of the discovery rule which has been specifically adopted by the legislature.

Likewise, we reject the interpretation that the "injury" occurs for purposes of the statute of limitations on the date that the injury manifests itself in a physically objective and ascertainable manner. The physical damage test fails to account adequately for all relevant factors. In some cases, such as the discovery of a sponge left in the patient during surgery (*Peralta v. Martinez*, 90 N.M. 391, 564 P.2d 194 (N.M.App.1977)), the discovery of the physical injury may occur simultaneously with the discovery of the only possible cause, i.e., the doctor's negligence. However, where the injury is consistent with post-operative recovery and treatment is continued by the treating doctor who reassures the patient that there is no permanent damage, the patient who reasonably trusts the doctor and relies upon the physician's advice would be unfairly barred from bringing suit. In addition, the physical injury standard requires a claimant to immediately file suit against a physician, even though the plaintiff has no knowledge of any wrongful conduct on the part of the doctor. Courts should not adopt a construction of a statute which may encourage the filing of frivolous claims. In *Foil v. Ballinger*, 601 P.2d 144, 147–48 (Utah 1979), the Utah Supreme Court cogently summarized the rationale for rejecting this interpretation of the word "injury":

"While the recipient may be aware of a disability or dysfunction, there may be, to the untutored understanding of the average layman, no apparent connection between the treatment provided by a physician and the injury suffered. Even if there is, it may be passed off as an unavoidable side effect or a side effect that will pass with time.... [W]hen injuries are suffered that have been caused by an unknown act of negligence by an expert, the law ought not to be construed to destroy a right of action before a person even becomes aware of the existence of that right.

"Furthermore, to adopt a construction ... that encourages a person who experiences an injury, dysfunction or ailment, and has no knowledge of its cause, to file a lawsuit against a health care provider to prevent a statute of limitations from running is not consistent with the unarguably sound proposition that unfounded claims should be strongly discouraged....

"It would also be imprudent to adopt a rule that might tempt some health care providers to fail to advise patients of mistakes that have been made and even to make efforts to suppress knowledge of such mistakes in the hope that the running of the statute of limitations would make a valid cause of action nonactionable."

 The most recent pronouncement by an appellate court involving a statute which employs the words "act or omission" and "injury" is found in *Moore v. Jackson Park Hospital*, 95 Ill.2d 223, 69 Ill.Dec. 191, 447 N.E.2d 408 (Ill.1983). The Illinois statute formulates the discovery rule as the claimant "knew, or through the use of reasonable diligence should have known," Ill.Rev.Stat., ch. 83, ¶ 22.1 (1977). The discovery rule is phrased in the Colorado statute as "discovered, or in the exercise of reasonable diligence and concern should have discovered...." Section 13–80–105(1), C.R.S.1973 (1983 Supp.). We view this semantic difference as insignificant. The Illinois Supreme Court adhered to its previously adopted legal injury rule and stated:

"In medical malpractice cases in which the discovery rule is applied the cause of action accrues when the plaintiff knows or reasonably should know of an injury and also knows or reasonably should know that it was wrongfully caused.... Logic dictates that a plaintiff cannot bring a cause of action until he knows or reasonably should know of his injury, and also knows or reasonably should know that the injury was caused by the wrongful acts of another."

*Moore*, 69 Ill.Dec. at 226–27, 447 N.E.2d at 411–12. We are persuaded that under the legal injury standard, the "act or omission" is the equivalent of wrongful conduct and is but one element of the "injury," as that word is used in the two-year statute of limitations.

 We hold that the statute of limitations begins to run when the claimant has knowledge of facts which would put a reasonable person on notice of the nature and extent of an injury and that the injury was caused by the wrongful conduct of another. The overwhelming majority of state appellate courts which have addressed the issue here have adopted the "legal injury" construction of the word "injury" used in statutes of limitation governing medical malpractice actions. The focus is on the plaintiff's knowledge of facts, rather than on discovery of applicable legal theories. Decisions by the appellate courts of California, Hawaii, Iowa, Nevada, New Hampshire, New Jersey, North Dakota, Ohio, Oregon, Utah, and West Virginia support this interpretation of the word "injury." [12]

**12.** *See Graham v. Hansen*, 128 Cal.App.3d 965, 180 Cal.Rptr. 604 (1982) (statute of limitations begins to run when the patient has before him facts which would put a reasonable person on inquiry notice of his possible cause of action, whether or not it has occurred to the particular patient to seek further medical advice); *Yamaguchi v. Queen's Medical Ctr.*, 648 P.2d 689 (Hawaii 1982) (cause of action accrues when the plaintiff discovers, or should have discovered, the negligent act, the damage, and the causal connection between the former and latter); *Baines v. Blenderman*, 223 N.W.2d 199 (Iowa 1974) (statute of limitations does not begin to run in a medical malpractice case until the injured person knows or can be charged with knowledge of the existence of his cause of action); *Massey v. Litton*, 669 P.2d 248 (Nev.1983) ("injury" as used in medical malpractice statute of limitations means legal injury, i.e., all essential elements of malpractice cause of action); *Brown v. Mary Hitchcock Memorial Hosp.*, 117 N.H. 739, 378 A.2d 1138 (1977) (in a medical malpractice case the plaintiff's cause of action does not accrue until he discovers, or should (not could) have discovered, that the injury may have been caused by the defendant's negligent conduct); *Silverman v. Lathrop*, 168 N.J.Super. 333, 403 A.2d 18 (1979) (cause of action accrues not when the plaintiff receives legal advice as to the merits of his claim, but rather when he discovers significant facts which provide the basis for a medical malpractice claim); *Iverson v. Lancaster*, 158 N.W.2d 507 (N.D.1968) (limitations period commences to run against malpractice plaintiff from time act of malpractice with resulting injury is, or by reasonable diligence could be, discovered); *Schiele v. Hobart Corp.*, 284 Or. 483, 587 P.2d 1010 (1978) (statute of limitations for commencing action to recover for injuries to person begins to run on claim for occupational disease allegedly resulting from defendant's negligence when a reasonably prudent person associates his symptoms with a serious or permanent condition and at the same time perceives the role which the defendant played in causing that condition); *Berry v. Branner*, 245 Or. 307, 421 P.2d 996 (1966) (the cause of action for medical malpractice accrued at the time plaintiffs obtained knowledge, or reasonably should have obtained knowledge, of the tort committed upon her person by defendant). *see also Duncan v. Augter*, 62 Or.App. 250, 661 P.2d 83 (1983), and *Dortch v. A.H. Robins Co., Inc.*, 59 Or.App. 310, 650 P.2d 1046 (1982); *Foil v. Ballinger*, 601 P.2d 144 (Utah 1979) (the term "discovery of injury" means discovery of the

### D.

We turn to the question of whether the trial court properly granted the motion for summary judgment filed by Mastro. The trial court and the court of appeals concluded that Brodie discovered her injury in July of 1977. However, we believe that there are issues of material fact to be resolved at trial.

In *Baines v. Blenderman*, 223 N.W.2d 199 (Iowa 1974), the Iowa Supreme Court held that the discovery rule requires both knowledge by the claimant that an injury has occurred and that the injury was caused by the wrongful conduct of the defendant. In *Baines*, the defendant argued that the claimant's perception of physical harm should be equated with imputed knowledge of its origin in malpractice. The court rejected the contention. The court stated that knowledge of an injury may or may not be sufficient to alert a reasonably diligent person to the basis of a claim, depending upon the circumstances of the case. However, in order for the statute of limitations to bar the claim, it is not necessary for the defendant-physician to prove that the claimant knew the specific acts of negligence committed by the defendant or that he knew the details of the evidence which were necessary to prove the claim. It is enough that the claimant knew, or may reasonably be charged with knowledge of, sufficient facts to be aware that a claim existed more than two years before it was filed.

The court in *Baines* stated that the fact the claimant received assurances from his doctor that nothing was wrong, although a factor to be considered on the issue of reasonable diligence, does not necessarily mean that the plaintiff should have known sooner than he did of the defendant's alleged malpractice. Thus, the court concluded it is a question of fact as to when the plaintiff discovered, or in the exercise of reasonable care should have discovered, that his injuries were caused by

physical injury and the negligence which resulted in the injury); *Renner v. Asli,* 280 S.E.2d 240 (W.Va.1981) (limitations period does not begin

the wrongful conduct of the defendant. The court held that in such cases summary judgment is inappropriate. This result is consistent with our decisions in *Owens v. Brochner,* 172 Colo. 525, 474 P.2d 603 (1970), and *Davis v. Bonebrake,* 135 Colo. 506, 313 P.2d 982 (1957), in which we held that whether the statute of limitations bars a particular claim is a fact question. Therefore, only in the clearest of cases may a summary judgment motion be granted where discovery of the injury is the pivotal issue. Here, it is a question of fact whether, during the period from July 1977 to July 1979, Brodie should have discovered that either Mastro had been negligent in performing the surgery or that he had failed to advise her before surgery that a keloid scar could develop and that she was a member of a high risk class, or whether Brodie discovered her injury when she visited the specialist in Denver during the month of August 1979, when she was advised of her high risk status for keloid scarring.

The judgment of the court of appeals is affirmed.

ROVIRA, J., dissents.

ERICKSON, C.J., joins in the dissent.

ROVIRA, Justice, dissenting.

I dissent from Parts II(B), (C), and (D) of the majority opinion. In particular, I disagree with the majority's interpretation of the word "injury" and with the majority's application of that interpretation to the facts of this case. In both instances, the analysis presented by the majority is carefully tailored to achieve a certain result. It also signifies a growing discomfort in close cases with the standard operation of statutes of limitation. I am not unaware of these tensions. At the same time, I prefer a more straightforward approach than that adopted by the majority in this case.

On its face, section 13–80–105 neither defines the word "injury" nor provides

to run until the plaintiff has knowledge, or in the exercise of reasonable diligence has reason to know, of the medical malpractice).

guidance on how to determine when an injury has been discovered. The majority therefore identifies and compares several interpretations before deciding that the "legal injury" interpretation is what the legislature really intended when it enacted the statute. In my view, however, the "legal injury" interpretation ignores the recent legislative history of section 13–80–105. This statute was amended on July 1, 1977.[1] Before that date, persons were prohibited from maintaining malpractice actions based on negligence or breach of contract

> "unless such action is instituted within two years after the person bringing the action either discovered, or in the exercise of reasonable diligence and concern should have discovered, the seriousness and character of his injuries *and* the negligence or breach of contract which gave rise to such action. In no event may such action be instituted more than five years after the act or omission which gave rise thereto...."

Section 13–80–105, C.R.S.1973 (emphasis added). A separate statute established another two-year statute of limitations for malpractice actions based on lack of informed consent. It provided:

> "No person shall be permitted to maintain an action for noncompliance with [the statute imposing a duty on physicians to provide information sufficient for informed consent] unless such action is instituted within two years after the person bringing the action either discovered or in the exercise of reasonable diligence and concern should have discovered the *injury* about which the patient was not informed."

Section 13–80–105.5, C.R.S.1973 (1976 Supp.) (emphasis added). Effective July 1, 1977, the General Assembly revised and combined these two statutes. It repealed section 13–80–105.5 and inserted "lack of informed consent" in section 13–80–105. It also deleted the provision in section 13–80–105 calling for discovery of the negligence or breach of contract which gave rise to such action.

These changes convince me that the word "injury," as used in the current statute, does not mean "legal injury." It defies common sense to conclude, as the majority does, at 1167, that even though the legislature deleted the words "and the negligence or breach of contract" from the statute, it simultaneously inserted the concept of legal injury into the single word "injury" that remained in the statute. If the legislature intended the revised statute to include the concept of legal injury, it certainly would have avoided such confusing subterfuge. In the language of the majority, it would have "combine[d] a number of complex legal concepts into [one] legal term," *id.*, and that term would have been "legal injury."

In analyzing the current statute, I do not disagree with the basic premise that "injury" must mean something more than mere physical damage or manifestation. For example, the injured person may be aware of a physical manifestation but have no understanding of its seriousness; or the injured person may be aware of its seriousness but not associate it with a particular time, place, or person. In either situation, a person discovering the physical manifestation could be barred unfairly by the running of the statute of limitations. In *Gleason v. Guzman*, 623 P.2d 378 (Colo.1981), we invalidated a personal injury release on the grounds that the executor of the release was mistaken about the true nature of the injury suffered. We stated:

> "Knowledge of the nature of an injury requires an awareness and some appreciation of its extent, severity and likely duration. *See, e.g., ... Mitzel v. Schatz*, 175 N.W.2d 659 (N.D.1970); *Poti v. New England Road Machinery Co.*, 83 N.H. 232, 140 A. 587 (1928). Admittedly, line-drawing here is difficult and its direction may well vary with the thrust of evidence. These basic components of

---

**1.** *See* An Act Concerning Limitation of Actions, and Relating to the Period During Which a Person May Maintain an Action for Medical Malpractice, Colo.Sess.Laws 1977, ch. 198, 13–80–105(1) at 817.

knowledge, however, relate primarily to a comprehension of the basic character of the injury as distinct from a prediction or opinion about the future course of recovery when its basic nature is otherwise unknown."

*Gleason*, 623 P.2d at 385.

I would prefer that this court adopt an approach similar to *Gleason* in this case. Our emphasis in *Gleason* on recognizing the seriousness and character of one's injury represents a middle ground between the view that discovery of the physical injury is enough, *see Allen v. Newport*, 427 F.Supp. 42 (M.D.Tenn.1976), and the view that discovery of the "legal injury" is required. Under this approach, the pivotal question in this case becomes whether Brodie discovered or reasonably should have discovered the "seriousness and character" of her injury more than two years before she filed her complaint.

As a general rule, the trier of fact should decide whether the statute of limitations bars a particular claim. *Owens v. Brochner*, 172 Colo. 525, 474 P.2d 603 (1970); *Davis v. Bonebrake*, 135 Colo. 506, 313 P.2d 982 (1957). However, the trial court in this case decided that summary judgment was appropriate, since the evidence, when viewed in the light most favorable to Brodie, revealed that she was "fully aware" of her injury by July 1977. The court of appeals agreed; in its view, the evidence was "undisputed" that Brodie discovered her injury more than two years before she filed her complaint. *Brodie v. Mastro*, 638 P.2d 800, 801 (Colo.App.1981). After reviewing Brodie's deposition, I concur with the courts below that she discovered her injury by July 1977.

Brodie originally went to see Mastro in part because both she and her mother thought the nodule might be cancerous. She did not consider the nodule unsightly and would have declined surgery had she known that a large and "ugly" scar would develop on her shoulder. She specifically asked Mastro about scarring because she did not want a bad scar. The scar from the surgery was small and normal-looking when Brodie returned to have the sutures removed. She did not discuss the surgery at that time because "[t]here was nothing wrong then." During the next several months, both she and her mother noticed that the scar was "growing" and "getting bigger." It itched and became painful. Brodie knew that the scar was "real bad" and did not resemble other scars she had on her own body and other scars she had seen. As she kept track of the scar on her shoulder, she became aware for the first time that scars could become "this big or this unsightly." She returned to Mastro's office in July 1977 specifically to complain about the size and appearance of the scar. It was enlarged, raised, unsightly, uncomfortable, and painful in July 1977. She found it embarrassing and tried to cover it with clothing so that other people would not see it. After Mastro told her there was nothing more he could do, Brodie sought out and received further treatment, including a series of injections into the scar tissue, from at least two other doctors, neither of whom mentioned keloids or the risk of keloids. She also discussed her scar with at least two attorneys because she remained "unhappy" about what had happened. She waited, however, until the latter part of 1979 to bring her action because she wanted, if possible, to "tr[y] to get it fixed" first. Finally, after the plastic surgeon explained to her the nature of keloids, she brought her action against Mastro because he "misled" her by not warning her about the risk of bad scarring.

Brodie's deposition testimony indicates that she discovered the physical manifestation resulting from the surgery within several months after the surgery on her shoulder. It also demonstrates that she was fully aware of both the seriousness and character of her injury when she saw Mastro in July 1977. At that point, she had a true appreciation of the extent and severity of her injury and a clear perception of Mastro's role in inducing it. She knew and was upset that Mastro had not warned her about the possibility of bad scarring. The *only* piece of information not in her posses-

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

sion in July 1977 was the knowledge that, as a young, dark-skinned female, she fit into a high-risk category. While this knowledge may have increased her understanding about what happened, she did not need to know *why* the keloid appeared in order to bring an action based on lack of informed consent. She only needed to know that it *did* appear and that Mastro never warned her about it.

This point can best be illustrated by analogizing Brodie's situation to that of a light-skinned person. If a light-skinned person undergoes surgery and develops a keloid, and if the physician never mentioned the admittedly low risk of keloid scarring in a light-skinned person, that person would have a cause of action based on lack of informed consent. *See Bloskas v. Murray*, 646 P.2d 907 (Colo.1982) (duty to warn turns on significance of the risk to the patient's informed decision to submit to the medical procedure); *Mallet v. Pirkey*, 171 Colo. 271, 466 P.2d 466 (1970) (physician has affirmative duty to warn patient of substantial risks). The complaint would allege that the physician never warned the patient about the risk of bad scarring. The fact that a light-skinned person fits into a low-risk category would be of no significance to the plaintiff's cause of action. That fact would only be important when the trier of fact decided if the physician's failure to warn was consistent with community standards for this particular risk. *See Bloskas*, 646 P.2d at 914 (duty of disclosure depends upon the extent of information given by reasonably careful physicians in the same or similar community); *Miller v. Van Newkirk*, 628 P.2d 143 (Colo.App. 1980) (whether disclosure was adequate depends upon community standards); *Stauf-*

*fer v. Karabin*, 30 Colo.App. 357, 492 P.2d 862 (1971) (failure to inform must be consistent with community standards); *Colo. J.I.* 15:16 (1984 Supp.).[2]

I see no reason to distinguish between a light-skinned person, with a low risk of keloid scarring, and a dark-skinned person, with a high risk of keloid scarring, for purposes of determining when a person discovers his or her injury. Discovery of injury in an informed consent case should not mean one thing for a low-risk person and another for a high-risk person. Yet, by suggesting that Brodie may not have completed the necessary discovery until she learned of her high risk, the majority appears to have imposed an artificial distinction based on a person's particular level of risk. That level of risk will affect the factual determination at trial of whether the failure to warn was consistent with community standards. It should not, however, affect the outcome of a summary judgment motion based on the running of the two-year statute of limitations. The outcome in this case is dependent upon whether Brodie discovered the seriousness and character of her injury and whether she realized that Mastro never warned her about the possibility of bad scarring. In my view, she made the necessary discovery by July 1977, more than two years before she filed her complaint.

Accordingly, I dissent.

I am authorized to say that ERICKSON, C.J., joins in this dissent.

---

2. "Before a physician (treats) (operates on) (or) (performs a procedure on) a patient, he has a duty to secure the informed consent, whether express or implied, from the patient.
For a patient's consent to be an informed consent, a physician must have informed the patient of the following:
 1. The nature of the ailment;
 2. The nature of the (operation) (procedure) (or) (treatment);
 3. The alternative treatments available, if any, and

4. The substantial risks, if any, involved in undergoing the (operation) (procedure) (or) (treatment), and the substantial risks, if any, involved in undergoing any alternative treatments available.
A physician has a duty to inform a patient of the above ... items to the extent a reasonable physician practicing in the same field of practice (as a general practitioner in the same or similar locality) (as a specialist) at the same time would have informed the patient under the same or similar circumstances."